SHAWMUT MANUFACTURING COMPANY, Appellant,

*vs.*

TOWN OF BENTON.

Kennebec.     Opinion August 30, 1923.

*Contemporaneous and subsequent interpretation by those in interest, where there is uncertainty in the meaning of a town's charter, may assist in construing it, but an erroneous recognition of the location of a town's boundary line, though universal and long continued, must yield to the author ty of the act of incorporation, for the Legislature can establish and change the boundaries of towns at will. An incorporated territory bounded by an innavigable stream of water ordinarily extends to its thread. A taxpayer whose property is overrated in the sense of an overestimation, or whose property, intentionally, is assessed by the taxing officials at its full and true value, while the property of others in the same class likewise is assessed at an undervaluation, has a remedy by abatement.*

Towns are without power to alter boundary lines. They cannot enlarge their extents or taxing jurisdictions by prescription.

The Legislature, in incorporating the present town of Benton, defined the central line of the Kennebec river as that town's western limit.

Water power, in and of itself, is not taxable.

A petitioner for an abatement of taxes must show that his property is overrated; that the valuation, having reference to just value, is manifestly wrong, or that an unjust discrimination, denying the equal protection of the laws, exists. Otherwise, as in this case, his petition will be dismissed.

On report. The appellant, owning a dam across the Kennebec river, between the towns of Benton and Fairfield, and the bed of the river on which it is erected, and the land against which it abuts, petitioned the assessors in Benton for an abatement of taxes assessed in that town for the year 1920. The petition was denied and an appeal entered to the commissioners of Kennebec county. From the adverse decision of the county board the case was brought by further appeal to this court at nisi prius, where these points were in dispute: that the easterly bank of the river, and not the river's thread, is Benton's western corporate boundary; that the appellant's property is overrated in the sense of a rating above its true value; that because of an unjust discrimination, by scheme of the taxing officers, in deliberately assessing its property at full value, while the other property in the town is assessed at a less measure, the equal apportionment clause of the Constitution of Maine is infringed, and, in violation of the Fourteenth Amendment of the Federal Constitution, the equal protection of the laws is denied. None of the issues being sustained by the appellant in the Law Court, for decision by which both the facts and the law were reserved, the appeal was dismissed with costs.

The case is stated at length in the opinion.

*Weeks & Weeks*, for appellant.

*Harvey D. Eaton*, for appellee.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

DUNN, J. An appeal under R. S., Chap. 10, Secs. 79 and 80, first, to the commissioners of Kennebec county, and from the adverse decision of that board to this court at nisi prius, from the denial by local assessors of a petition for an abatement of taxes assessed in 1920. The Justice below reserved the case, both of fact and law, for final judgment by the Law Court.

The issue was broadened, by mutual consent of the parties, beyond the allegations of the petition and the reasons of the appeals, to include the enquiry of whether all the assessed property was within the territorial limits of the town of Benton. The case being here on report, with technical pleading no longer a matter of concern, this new question has been considered. A study of the evidence fails to sustain the assertion that the assessors mistook the true and legal position of Benton's western boundary line. If in passing there be granted, what it is not necessary at present to decide, and that is that the river boundary of the original township of Clinton, from which Sebasticook, now called Benton, was set off into a separate town, was laid down by Massachusetts at the bank, and not in the middle of the river, then any dominion over the land between the bank and the river's thread was never placed elsewhere by that Commonwealth, except that eventually the title thereto was vested in our own State of Maine. The act incorporating Clinton is numbered 62 in the Massachusetts Laws of 1794-5; that incorporating Sebasticook, Chapter 40, Maine P. & S. L. 1842; and that changing the name to Benton, Chapter 311, Maine P. & S. L. 1850.

Towns are without power to alter boundary lines. They cannot enlarge their extents or taxing jurisdictions by prescription, however extended in time. *Eden* v. *Pineo*, 108 Maine, 73. If uncertainty attach to a charter's meaning, contemporaneous and subsequent interpretation by those in interest might aid in construing that which ink and paper were made to say. But mere erroneous recognition of the location of a town's boundary line, in spite of universal but mistaken supposition that the accepted place was the right one, cannot be superior and paramount in dignity and importance to the authority of the act incorporating the town. This, however, does not affect the case in hand one way or the other, since no ambiguity lies concealed on its page.

Commissioners, appointed in appropriate judicial proceedings, can ascertain and fix lines in dispute between towns, "and such lines shall be deemed in every court and for every purpose the dividing lines between such towns." R. S., Chap. 4, Sec. 136; *Winthrop* v. *Readfield*, 90 Maine, 235. That was done in 1896 as regards the line for a part of the way between Benton and the town of Fairfield on the opposite side of the river, but the report of the commissioners depends so much upon localities that it is not easy to make it

intelligible without reference to a plan which is not in evidence; nor is it necessary to do so, because the line so determined is not involved.

. If Massachusetts delimited Clinton's bound at the river's bank, it does not necessarily follow that Sebasticook's line was drawn there too. Whether it was or not depends upon a construction of the act of incorporation, for the Legislature may establish and change the boundaries of towns at will. The descriptive part of the act or charter in question is thus: All of Clinton lying south and east of a dividing line, "beginning on the Kennebec river, in the centre line between L 2 and K 1," thence to and up the Sebasticook river, "in the centre thereof," to the east line of Clinton, shall be the new town. A punctuation point, a comma inserted after the word "line" and before the word "between" would have made it readily possible for the reader's eye to ken, at a single glance, where distinctive meaning came into play: "beginning on the Kennebec river, in the centre line (,) between L 2 and K 1." L 2 and K 1 are inferred to refer to a dividing line between lots delineated on a plan which mention made a part of the description, and a lot-dividing line scarcely could be perceived to have a center.

Ordinarily, where a stream of water, above the tide, and therefore not technically navigable, constitutes the boundary line of an incorporated territory, the thread of the stream is the true boundary line. *Perkins* v. *Oxford*, 66 Maine, 545. There is nothing to take this case out of the general rule. By implication of law, in the absence of negativing words, the side lines of a riparian proprietor, whose estate is bounded by an innavigable river, are extended from the termini on the margin, at right angles from the stream, to include one half of the bed of the river. A description "on" the stream carries likewise. *Lowell* v. *Robinson*, 16 Maine, 357; *Pike* v. *Munroe*, 36 Maine, 309; *Wilson* v. *Harrisburg*, 107 Maine, 207. Township boundaries are construed in like manner. *Perkins* v. *Oxford*, supra. Not only was Sebasticook's line begun "on" the river, but it was begun "in the centre line between L 2 and K 1"—the very centre line which marked the easterly boundary of the domain of the adjoining municipality of Fairfield, at which the Legislature was free to begin. The line was run to another river's centre and up that river to the old town's easterly exterior. All the territory south and east of that line, and by necessary conclusion west and north of other lines, became Sebasticook. The central line of the Kennebec river was made that town's western limit.

To pursue this phase a step further:    Thirty-one years afterward Bunker's Island was taken from Sebasticook, or Benton as it had come to be known, and made a part of Fairfield.    Note, in Chapter 390, P. & S. L. 1873, this language:    "All that part of the town of Benton lying westerly of (a line) beginning in the west line of Benton in the middle of the Kennebec river," etc.    In the knowledge of this evidence any doubt as to the situation of the river boundary of Benton is set at rest.    The reverse of the contention that the bank is the confine is conformable to fact.    Changed only by the set-off of the island, a thing inconsequential in these proceedings, the line remains as it was established.

So thus far, an abatement, if it is to be had, must be posited upon a showing that the petitioner, being liable to assessment, is overrated in the sense of an overestimation; of a rating of its property above its true value, *Penobscot, etc., Company* v. *Bradley,* 99 Maine, 263; of being valued too highly, Webster's Dict.; "Sir, you o'errate my poor kindness," Shak., Cymbeline, 1, IV, 40.

The appellant owns a dam across the Kennebec river, between the towns of Benton and Fairfield, together with the bed of the river on which it is erected, and the land at either end against which it abuts.    This dam, built of concrete in 1912-13, creates a head, in an average flow of twenty feet; throwing back the water for a distance of ten miles, and draining a watershed four thousand two hundred and fifty square miles in area.    The banks of the river are high and steep some of the way, though "in places they are a little shoal," "but usually higher than the ordinary water level," consequently the flooding is comparatively little.    The development, when the river is neither appreciably shrunken by droughts nor swollen by freshets, approximates 6,000 horse power.    The energy finds application in generating electricity on the western or Fairfield side, none being used in Benton.

The Benton assessors set the valuation at $75,000.00, on "that part of (appellant's) privilege water right and dam in Benton bounded as follows:    on the north, east and south by land of the Company . . . on the west by the Fairfield town line."

The obligation of showing adequate reason for changing the existing order of things rests upon the appellant.    It must prove enough at least to make a prima facie case before it can be entitled to have its appeal sustained.    There is not, in the record, any evidence

showing that the property stands of valuation on the assessment book for more than its actual worth. There is evidence that the cost of building the Benton part was, in round numbers, $50,000.00, without the worth of the land on which it is built, and the water-covered land behind it, and the bank next it. Witnesses say that, since its building, the structure has appreciated rather than depreciated in value, due to the hardening and strengthening of the cement, the attendant element of indefinite life, and the actual demonstration of the dam's capacity to hold in check the mighty waters of the severest floods ever known to fall upon the basin supplying its reserve of stored force. And there is evidence that increases for labor and materials would make the cost of reproduction double that originally incurred.

It appears, too, that heretofore the official valuation was of lesser amount. But, being inadmissible, this must be allowed to flow by, like surplus water through the dam's wasteweir and over its crown. Boards of assessors come into existence annually in the several towns in virtue of a delegation of choosing power by the Legislature. These boards go on in the discharge of duty as each sees it to do amid changing conditions. And valuations, in resemblance to values, are chameleon-like things, varying from time to time, with regard to the objects about them, in the estimation of different officials. Once a board has fixed its valuation, its saying is as a story that is told, a chapter that is closed; if not unsaid after the manner of the statute.

Water power, as has been argued, in and of itself, is not taxable. The reason why is that the riparian proprietor has no property in the water which runs by his land. He has, as incident to his ownership, the right of interrupting and using the water, for needed and useful industries and otherwise, while it passes along; and of taking thereby all the profit, utility, and advantage which it may produce, without prejudice to the rights of other owners, above or below, unless he has acquired a superior right. In a word, he has the correlative rights and duties of a usufructuary.

Insistence that the words "water right" in the record of the assessment are a substitute expression for "water power" does not find assent in the mind addressed. Difficulty is continually experienced in so expressing an idea that the language implies no more and no less than just what is intended. Unstudied or colloquial

speech, the intention of which the man in the street knows, often suggests meaning in more vividness and force than literal statements could. The effectiveness of such expressions is the aptness of the relations between things which they mark.

That which the assessors wrote is interpretable: We are levying, not simply a tax on a dam by a dam site, but, additionally, a tax on the site by the dam, the "privilege water right," unoccupied at the present time, but with potential possibilities, attributable to advantageous position, affecting just and assessable value, in the view of sovereignty's taxing power. So is the law of the ruling cases. *Saco, etc., Company* v. *Buxton*, 98 Maine, 295; *Penobscot, etc., Company* v. *Bradley*, cited before. Plain common sense.

But the appellant argues further. It advances that, not as a result of mere error of judgment, but deliberately, a system of valuation was adopted, by those whose duty it was to make the assessment, which was designed to operate unequally and to violate the fundamental principle of uniformity.

The charge is grave. Were it proved it would distinctly spell unworthiness and wrong; it would disclose an intentional ignoring by the local officers of the constitutional provisions which they swore that they would uphold; it would tend to dim that justice which is the end of government.

"Every person elected . . . to . . . office under this State, shall, before he enter on the discharge of the duties of his place or office, take and subscribe the following oath or affirmation: 'I——do swear, that I will support the Constitution of the United States, and of this State, so long as I shall continue a citizen thereof. So help me God'. 'I——do swear that I will faithfully discharge, to the best of my abilities, the duties incumbent on me as . . . , according to the Constitution and laws of the State. So help me God'." Con. of Maine, Art. IX, Sec. 1.

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U. S. Con., Amend. XIV, Art. 1.

"All taxes upon real . . . estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof. . . . ." Con. of Maine, Art. IX, Sec. 8.

Constitutional provisions are not self-executing; they have to be accomplished through human agency, imperfect as the means may be. But, fallible and finite though these agents are, there must be respect by them for the Constitutions, else they would have a government of law run riot.

The principle of equality, as courts and economists have observed, is cardinal in taxation. It requires a fair and equitable distribution so that each taxpayer shall contribute in proportion to his property. "Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of the assessment, as well as in the rate of taxation." *Cummings* v. *National Bank,* 101 U. S., 153, 25 Law Ed., 903, a case holding that equity will interfere to restrain the operation of an unconstitutional exercise of power. Our own court has said that fraudulent action by assessors may be so corrected. *Bath* v. *Whitmore,* 79 Maine, 182, 186.

There are two ways, it is the consensus of judicially sanctioned view, in which a taxpayer may be wronged in the levying of taxes: he may be assessed on an excessive valuation, or he may be taxed on the basis of the just value of his property, while, by scheme of the taxing officers, the other property, in like situation, in the same jurisdiction is assessed at less than the just value thereof. When this is done, the central principle of equality, both in respect to the subject-matter and the ratio of taxation, is disregarded. If property is assessed excessively, the wrong may be righted easily. Where assessors knowingly and meaningly assess one property at its just value and the other property of the same class at less than its just value, there is a wrong. And if the wrong were not redressed there would be a denial of justice. Cases holding that a taxpayer so circumstanced cannot be relieved may be found quickly. But the other way around is best.

Under the topic of assessments at full value when valuations generally are less, an editor in L. R. A. well wrote, in volume 60, at page 368:

"It is true in a sense that a taxpayer whose property is assessed for taxation for no more than it is fairly worth suffers no wrong. Yet, if his neighbors are habitually and continually assessed upon their property at less than it is worth, it is plain that he pays more than his proportion of taxes, and that the rule of equality and

uniformity of taxation is violated. . . . Whenever it can be established indisputably by competent and sufficient evidence that a given assessment upon an aggrieved taxpayer's property has been laid upon a distinctly higher valuation than the assessments . . . upon the property of the taxpayers in general, and that this discrimination was intentional, . . . . the courts will intervene to reduce or annul the tax to the extent necessary to place the complaining taxpayer upon a plane of equality with others in his class."

In the case of *Sunday Lake Iron Company* v. *Wakefield*, 247 U. S., 350, 62 Law Ed., 1154, quoted approvingly and stiffened by the citation of analogous cases in *Sioux City Bridge Company* v. *Dakota County*, (announced January 2, 1923) 260 U. S., 441, 67 Law Ed., . . ., the Supreme Court of the United States said:

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express words of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property."

In Nebraska, (182 N. W., 485, the Sioux City Bridge Case below), the Supreme Court of that State held that, assuming the proof of discrimination, the sole remedy of the complaining taxpayer was "to have the property assessed below its true value raised, rather than to have property assessed at its true value reduced." Said Chief Justice Taft, oppositely, in delivering the opinion of his court, on certiorari to the Nebraska court:

"Such a result is to deny the injured taxpayer any remedy at all because it is utterly impossible for him by any judicial proceeding to secure an increase in the assessment of the great mass of underassessed property in the taxing district. This Court holds that the right of the taxpayer whose property alone is taxed at 100 percent of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of the statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and

ultimate purpose of the law." "There can be no doubt," remarks the Chief Justice earlier, "of the view taken by the federal courts in the enforcement of the uniformity clauses of state statutes and constitutions and of the equal protection .clause of the Fourteenth Amendment."

The law is. settled. Now for the facts: The advantage, in the beginning, is with the taxing authorities. They are public officers and what they say, oath-guided, is much set by. Their task is beset by difficulties at best. The system of taxation which it is for them to apply, like every other taxing method yet devised, is incapable of complete and perfect administration. Exact proportion or equality is impossible. There is no iron rule by which the public burden may be apportioned and imposed in equal exactitude. Burdens sometimes are made to rest unevenly, careful purpose otherwise notwithstanding. The proving of a mere error of human judgment, as has been indicated, will not support a claim of overrating; "there must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity." *Sioux City Bridge Company* v. *Dakota County.* (U. S.) supra.

As tending to show such premeditated transgression the appellant offers the testimony of two witnesses. The statement of one of them is so general and indefinite as to be without any convincing weight. The other, the register of deeds in the county, a resident and taxpayer of the town of Benton, sometime an assessor there, and more or less frequently buying and selling real estate therein, is more specific. From a registry search he selected, not all the transfers of Benton real estate by deed in 1920, but fourteen different lots. One of these he himself bought; he knew the selling price of another; both apparently above the assessment. Regarding the rest, using the revenue stamps on the individual instruments of conveyance as the bases of his estimates, each of these lots sold for more than the assessors' rating. And he had examined the assessment book at Benton. But the testimony of this practical, intelligent man does not show a distinction against the appellant's property. It does show that, in the opinion of the witness, all the taxable property in Benton is rated at from 55 to 60 per cent. of its just value; in sum, that what is owned there, and by whomsoever owned, meets taxability correspondingly undervalued. These are the questions

which were put to and the answers that were made by the witness, after he had spoken about examining the record of the fourteen lots:

Q. "Have you looked over the valuation book for the town of Benton for the year 1920?"

A. "I have."

Q. "In your opinion what is the percentage used in assessing the property in relation to its value?"

A. "Between 55 and 60 percent, that would be my judgment."

THE COURT: "Have you told the assessors about it?"

A. "I have not told anybody, only as I have testified before the commissioner. I was asked to go over the list on the books and also go over the assessors' books."

If it be that he meant his testimony to relate to the fourteen lots alone, it is enough to say in dismission, that, were the testimony otherwise sufficient, which is far from being suggested, the witness at no time differentiates the valuation of the appellant's property; he leaves it with a valuation comparable with that of all the other real estate, and bearing no more tax than it ought.

The remedy of the overvalued property owner is a broad and comprehensive enquiry which is not to be restricted by arbitrary and immutable rules inconsistent with substantial justness. But a petitioner for an abatement must make his case; he must show that his property is overrated; that the valuation, having reference to just value, is manifestly wrong, or that an unjust discrimination, denying the equal protection of the laws, exists; he must establish indisputably that he is aggrieved. This appellant's case does not so attain.

The appeal is dismissed. Costs must follow. R. S. supra.

*Ordered accordingly.*