GEORGE E. LEDIOYT ET AL., APPELLEES, V. COUNTY OF
KEITH ET AL., APPELLANTS.
No. 33724.

ROBERT K. SCOTT ET AL., APPELLEES, V. COUNTY OF KEITH
ET AL., APPELLANTS.
No. 33725.

WALDO A. NICHOLS ET AL., APPELLEES, V. COUNTY OF KEITH
ET AL., APPELLANTS.
No. 33726.

CARL P. NICHOLS ET AL., APPELLEES, V. COUNTY OF KEITH
ET AL., APPELLANTS.
No. 33727.

DAVID A. WELSH ET AL., APPELLEES, V. COUNTY OF KEITH
ET AL., APPELLANTS.
No. 33728.
74 N. W. 2d 455

Filed January 20, 1956.

*Beatty, Clarke, Murphy & Morgan,* for appellants.

*McGinley, Lane, Powers & McGinley,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

In 1953 the Keith County board of equalization, hereinafter called the county board, placed a valuation for tax purposes upon five separate described properties in Ogallala respectively owned in fee simple by George E. LeDioyt, Robert K. Scott, Waldo A. Nichols, Carl P. Nichols, David A. Welsh, and their respective spouses. All of the latter parties will be hereinafter called plaintiffs, or separately designated by name of the husbands. Each and all of plaintiffs' properties were recently constructed, modernly improved, commodious residence properties, favorably located, and respectively occupied by plaintiffs. Four of such homes were of brick veneer construction, and one was of brick veneer and stone construction. Thereafter each plaintiff filed a complaint, identical in form and character, with the county board. Each complaint alleged in substance that: (1) The separate valuations for tax purposes placed upon their described properties by the county assessor and the county board were arbitrarily made without foundation in fact to establish actual values, and that such properties were each overvalued for tax purposes in excess of their actual values; and (2) there existed a gross inequality between the values placed upon their respective properties and the values placed on other classes of real property assessed in the county, which resulted in a discrimination and an inequitable, unfair tax burden being cast upon plaintiffs, contrary to Article VIII, section 1, Constitution of Nebraska, and the Fourteenth Amendment to the Constitution of the United States.

After a hearing, the county board rendered an order denying each and all of plaintiffs' complaints. There-

from, each and all plaintiffs separately appealed to the district court. There they each filed petitions on appeal which were identical in form and character. The county of Keith, the county board of equalization and its members, including the county assessor, were named as defendants. Collectively they will be called defendants.

Plaintiffs' petitions each alleged in substance that their respective properties had been arbitrarily overvalued in excess of their actual value by defendants for tax purposes. Each then alleged that a gross inequity existed between the values placed by defendants upon their respective brick veneer or brick veneer and stone constructed properties and the values placed by defendants upon comparable wood or frame constructed properties within the county, which resulted in an inequitable and unfair tax burden being cast upon each and all plaintiffs, contrary to the constitutional provisions aforesaid. Plaintiffs prayed that a just value should be placed on their properties for tax purposes in accord with their actual value, and for equitable relief.

In each of such cases, defendants filed an answer, identical in form and character, denying generally, and alleging in substance that in the valuation of each of plaintiffs' properties for tax purposes, they acted in good faith with proper motives and in conformity with laws then applicable, and did value same for such purposes proportionately and uniformly with values placed upon all other tangible property and franchises in the county; that plaintiffs' properties were not assessed for tax purposes at a higher proportion of their actual value than the values for tax purposes placed upon all other tangible property and franchises; and that for 1953 plaintiffs' properties were not assessed at their actual values but were each assessed at much less, although they were assessed by valuation proportionately and uniformly with all other tangible property and franchises whereby plaintiffs were in no manner prejudiced or harmed by

the action of defendants. They prayed for a denial of any relief to plaintiffs, and for dismissal.

By stipulation, all five cases were consolidated for trial in the district court where they were so tried on the merits. However, separate judgments identical in form and character were rendered in each case. Each judgment found and adjudged that during 1953 properties of frame construction comparable with the brick veneer or brick veneer and stone properties belonging to plaintiffs were valued for tax purposes at 50 or 60 percent of their actual value, while plaintiffs' properties were each valued for tax purposes at approximately all of their actual value; that for 1953 and preceding years, the actual value of comparable frame or brick veneer and stone properties in the county was approximately the same; that the system of appraisal used by the county for tax purposes had resulted in a discrimination against plaintiffs and their properties; thus, a proper equalization of tax assessments against plaintiffs' properties required a 30 percent reduction of the valuation thereof as fixed by defendants. In accord therewith, such valuations were ordered reduced 30 percent, and defendants were ordered and directed to comply therewith.

Defendants' motions for new trial filed in each case were overruled, and they separately appealed each case to this court, where they were separately docketed. However, by stipulation of the parties, only one bill of exceptions and one set of briefs were filed, and the five appealed cases were consolidated for argument to and disposition by this court. Therefore, this single opinion will decide each and all five appeals.

Defendants in their brief assigned in substance: (1) That the trial court erred in its judgment rendered in each case by interfering with the values placed upon each of plaintiffs' properties for tax purposes during 1953 and by reducing such values 30 percent or any other amount, and in substituting its judgment for that of defendants in tax matters; (2) that each and all of said

judgments were not sustained by the evidence but were contrary thereto and contrary to law, and will result in unlawful tax discrimination in favor of plaintiffs and against all other owners of tangible property and franchises in Ogallala and Keith County, thereby allowing plaintiffs to escape their fair share and burden of taxation and causing all other owners to bear a greater burden than their fair share; (3) that the trial court erred in finding and adjudging that the system of appraisal for tax purposes used by defendants resulted in any discrimination against plaintiffs and their properties; and (4) that the trial court erred in failing and refusing to uphold the tax assessment values for 1953 placed on plaintiffs' properties by defendants. We sustain the assignments.

At the outset it should be noted that the final order of the State Board of Equalization and Assessment, hereinafter called the state board, directing that the values placed by the county board on all city and town properties in Keith County during 1953 should be raised 139 percent is not a controlling element. The issues involved herein are the valuations placed on plaintiffs' properties by the county board for tax purposes in 1953. In Homan v. Board of Equalization, 141 Neb. 400, 3 N. W. 2d 650, we held that: "Individual discrepancies and inequalities must be corrected and equalized by the county board of equalization. The duties of the state board of equalization are unrelated thereto and have no direct relationship to the duties of a county board of equalization." We also affirmed that: "The final orders of each must be given effect."

In that respect, section 77-1510, R. R. S. 1943, provides that appeals may be taken from any action of the county board of equalization to the district court, and section 77-510, R. R. S. 1943, provides for an appeal to this court from any final decision of the state board. The 1953 order of the state board, not having been appealed from, was final. In that regard, during 1951 and 1952 plain-

tiffs raised no objection whatever to values placed upon their properties for tax purposes by defendants. They made no objection thereto until after the final order of the state board had been made in 1953. The county board was required to give effect to such final order and it did so by increasing the value of all city and town properties in the county 139 percent for 1953.

Preliminary to a discussion of the evidence, we call attention to well-established laws and rules which are applicable and controlling.

In Weller v. Valley County, 141 Neb. 69, 2 N. W. 2d 606, we concluded that an appeal to the district court from action of a county board of equalization is heard as in equity, and upon appeal therefrom to this court, it is tried de novo.

Article VIII, section 1, Constitution of Nebraska, provides in part: "The necessary revenue of the state and its governmental subdivisions shall be raised by taxation in such manner as the Legislature may direct. Taxes shall be levied by valuation uniformly and proportionately upon all tangible property and franchises, * * *. Taxes uniform as to class may be levied by valuation upon all other property."

In Gamboni v. County of Otoe, 159 Neb. 417, 67 N. W. 2d 489, quoting with approval from State ex rel. Morton v. Back, 72 Neb. 402, 100 N. W. 952, 69 L. R. A. 447, this court said: " 'In all schemes of taxation there are generally recognized elements of inequality and the probability of erroneous valuations in the assessment of property by whatever mode the assessment may be made. The evil is usually remedied by the exercise of the authority of a board created for that purpose, whereby the assessment of different properties is brought to a common standard of value.'

"We then went on to say therein: 'The inequalities in values thus returned, if any there be, is a proper subject for consideration by a body or tribunal authorized to discharge the functions of a board of equaliza-

tion.' * * * ' "Whatever directions the law may give to the assessor in valuing the property in the first instance, and whatever result these directions may produce in the assessment of franchises or other property of the taxpayer, the work of the board of equalization is to equalize the valuations made, so that every one, as nearly as that may be attained, shall stand upon an equal footing, and pay an equal proportion of the tax laid, according to the real value of his property. * * * In this way, equality is attained and every interest protected." * * *' "

In State ex rel. Bee Building Co. v. Savage, 65 Neb. 714, 91 N. W. 716, this court said: "The paramount object of the constitution, and the laws relative to taxation, as we conceive the rule to be, is to raise all needful revenues by valuation of the taxable property so that each owner of property taxed will contribute his or its just proportion of the public revenues. The object of the law of uniformity is accomplished if all property within the taxing jurisdiction is assessed at a uniform standard of value, as compared with its actual market value, even though there be great disparity between value as assessed for taxes and the value as fixed in the open markets by barter, exchange, or by buying and selling, and other commercial transactions in which values and prices enter as important factors."

As stated in 51 Am. Jur., Taxation, § 152, p. 202, citing many authorities: "It is frequently recognized by the courts that absolute or perfect equality and uniformity in taxation are impossible. Such a conception has been variously characterized as 'utopian,' 'an unattainable good,' 'a baseless dream,' and 'a dream unrealized.' It has consequently been declared that the tax or revenue system which most nearly approaches perfect equality is the best, and that the most that can be expected is an approximation to this desirable end. Accordingly, substantial compliance with the requirements of equality and uniformity in taxation laid down

by the Federal and state Constitutions is all that is required, and such provisions are satisfied when designed and manifest departures from the rule are avoided."

In that regard, we said in Chicago, R. I. & P. Ry. Co. v. State, 112 Neb. 727, 200 N. W. 996: "The burden of proof is upon the company to establish its contention that the value of its property has been fixed by the board at an amount greater than its actual value, or that its assessed value has not been fairly and properly equalized when considered in connection with the assessment of all other property, so that this disparity and lack of uniformity result in an unjust and unfair assessment. * * * Approximation both as to value and uniformity is all that can be reached."

In Daniels v. Board of Review, 243 Iowa 405, 52 N. W. 2d 1, it is said: "A final word should be said as to the taxpayers' burden in these cases. On the claim of assessment in excess of actual valuation something more than a difference of opinion must be shown. Justice Bliss in the recent case of Clark v. Lucas County Board of Review, supra, at page 97 of 242 Iowa, had this to say of the taxpayer's burden on appeal from an assessment:

" 'The burden on the complaining taxpayer is not met merely by showing a difference of opinion between his witnesses and the assessor, unless it is manifest that the assessment is grossly excessive and is a result of the exercise of the will and not of the judgment.' (Citing cases.)

"On the claim of inequality of assessment the taxpayer's burden is not met by testimony that his property is assessed at a higher proportion to its actual value than *some* other property. The claim of inequality requires proof of assessments of similar property. And again this testimony must rise higher than a mere difference of opinion between the witnesses as to values. In short it must be such as to show the assessor and board did not do their duty. Judge Powers summed it all up

in Butler v. City of Des Moines, 219 Iowa 956, at page 961, 258 N. W. 755, at page 758, as follows:

" 'The problem of determining relative values in a situation of this kind is one of the most difficult with which the courts have to contend. There is no such thing as absolute equality in the assessment of property for taxing purposes. What might seem to one qualified person to be the proper difference in valuation between two pieces of property might to another person, equally qualified, seem to be inequitable and unjust. It is the judgment of the assessor which the statute requires in making these assessments. So long as his action is not arbitrary or capricious or so wholly out of line with the actual values as to give rise to the inference that for some reason he has not properly discharged his duty, the assessments made by him and confirmed by the local board of review should not be disturbed by the court.' "

Also, in Alfred J. Sweet, Inc. v. City of Auburn, 134 Me. 28, 180 A. 803, 104 A. L. R. 784, it is said: "Mathematical precision is impossible in dealing with taxable values. Uniformity can only be approximated. The court is not a board of review to correct errors. It is solely where there is evident a systematic purpose on the part of a taxing board to cast a disproportionate share of the public burden on one taxpayer, or one class of taxpayers, that the court will intervene. In Shawmut Manufacturing Co. v. Town of Benton, 123 Me., 121, 130, 122 A., 49, 53, this principle has been definitely enunciated in the following language, quoting with approval the words of Chief Justice Taft in Sioux City Bridge v. Dakota County, supra: 'The proving of a mere error of human judgment, as has been indicated, will not support a claim of overrating; "there must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity." ' "

In Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979, quoting with approval from Sunday Lake Iron Co. v. Township

of Wakefield, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154, and citing numerous other authorities, it is said: " 'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property. Raymond v. Chicago Union Traction Co., 207 U. S. 20, 35, 37.' " Also, in reversing the judgment of this court therein for failure to permit the bridge company to obtain a remedy of percentage reduction if there actually was a discrimination, the court said: "It is therefore just that upon reversal we should remand the case for a further hearing upon the issue of discrimination, inviting attention to the well-established rule in the decisions of this Court, cited above, that mere errors of judgment do not support a claim of discrimination, but that there must be something more— something which in effect amounts to an intentional violation of the essential principle of practical uniformity."

Further, in Sunday Lake Iron Co. v. Township of Wakefield, *supra,* the court, citing many authorities, said: "The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party."

Section 77-201, R. S. Supp., 1953, requires that all property in the state which is not expressly exempt shall be subject to taxation and shall be valued at its actual value but assessed at 50 percent of such actual value. In that regard, section 77-112, R. R. S. 1943, provides: " 'Actual value' shall mean value in the market in the ordinary course of trade."

Insofar as important here, section 77-1301, R. R. S. 1943, provided in part: "In all counties having a popula-

tion of not more than two hundred thousand population the county board of each county may, at its discretion, employ not more than three residents of the county to be known as a real estate classification and reappraisal committee. The committee may employ such assistants for classifying and reappraising as it deems necessary with the approval of the county board. Such committee shall examine and classify all land and town lots of the county. * * * Such lands shall be classified into as many classes or divisions as such committee believes is necessary. The committee shall then as directed by the county board reappraise all land and town lots of the county including the improvements thereon. The county assessor or county clerk where he is ex officio county assessor shall take into consideration the recommendation of the classification and reappraisement committee and shall value and assess the land, town lots and improvements thereon in accordance with the general rules and regulations to be provided by the Tax Commissioner. * * * The duties of the real estate classification and reappraisal committee shall terminate when its detailed classification and reappraisal report is accepted by the county board of equalization. After the first general classification of lands and town lots by such committee, the authority shall be vested in the county board of equalization to make reclassifications or additional classifications from year to year. When the real estate classification and reappraisal committee has completed the classification and reappraisal, it shall file the tabulation compiled by it with the county clerk for the use of the county board of equalization. The classification and reappraisal committee and its assistants shall have the same authority to examine the property to be classified and reappraised as that of the county assessor."

Midwest Popcorn Co. v. Johnson, 152 Neb. 867, 43 N. W. 2d 174, involved the constitutionality of section 77-1301, R. R. S. 1943, and other related sections not directly involved here. With regard thereto, this court

said: "There is no merit to this argument. The tax appraisal committee or board does not put a binding value on any property. The committee or board merely makes recommendations to the assessor and furnishes evidence for the use of the board of equalization. The valuation of property and the assessment of taxes is now, as it was prior to the passage of the act before us, the function of the assessor and the board of equalization. No changes have been made as to their duties and the requirements of uniformity. The duties of the tax appraisal committee or board in no manner disturb the requirements as to the uniformity of taxation. It remains as before. Consequently, Article VIII, section 1, is not violated."

Section 77-1311, R. S. Supp., 1953, provides in part that: "The county assessor, in addition to the other duties provided by law, shall * * * annually revise the real estate assessment for the correction of errors * * *. He shall have general supervision over and direction of the assessment of all property in his county. The county assessor shall obey all rules and regulations made under this chapter and the instructions sent out by the State Board of Equalization and Assessment."

Section 77-1501, R. R. S. 1943, now section 77-1501, R. S. Supp., 1953, created the county board of equalization, and section 77-1502, R. S. Supp., 1953, provides: "The county board of equalization shall hold a session of not less than three and not more than forty days, for the purpose contemplated in sections 77-1502 to 77-1507, commencing on the third Monday of May each year. It shall be authorized and empowered to meet at any time upon the call of the chairman or any three members of the board for the purpose of equalizing assessments of any omitted or undervalued property. The board shall maintain a written record of all proceedings and actions taken, which shall be available for inspection in the office of the county assessor." See, also, Ewert

Implement Co. v. Board of Equalization, 160 Neb. 445, 70 N. W. 2d 397.

In Novak v. Board of Equalization, 145 Neb. 664, 17 N. W. 2d 882, this court said: "Plaintiffs rely on the purchase price as constituting the actual value and cite authority from foreign jurisdictions and texts, to the effect that purchase price constitutes the fair market value of property. It is true that the purchase price of property may be taken into consideration in determining the actual value thereof for assessment purposes, together with all other relevant elements pertaining to such issue; however, standing alone, it is not conclusive of the actual value of property for assessment purposes, and many other matters relevant to the actual value of property appear in the record and must be considered in connection with the purchase price to determine the actual value."

Also, in Sioux City Bridge Co. v. Dakota County, 110 Neb. 597, 194 N. W. 729, this court said: "The consideration named in certain deeds was taken as indicative of the value of the real estate. The assessed value of the same property was then taken, and from a large number of such comparisons a percentage was worked out which indicated to the mind of the witness that the real estate in the county was assessed at 55.70 per cent. of its value. The witness admitted that in making his calculations he did not take into consideration all of the deeds, but only those which in his judgment presented a reasonable proportion between the consideration named and the assessed value. While this method, no doubt, is entitled to probative force, it is manifest that it is not conclusive and is subject to many imperfections. It is a matter of common knowledge that many sales are based on trades in which the consideration is inflated. The true test in all cases is to arrive at the fair value of the property."

As applicable here, Gamboni v. County of Otoe, *supra*,

held: "The valuation of property made by the proper assessing officer is presumed to be correct.

"The presumption is that, when an officer or assessing body values property for assessment purposes, he acts fairly and impartially in fixing such valuation.

"The presumption obtains that a board of equalization has faithfully performed its official duties, and that in making an assessment it acted upon sufficient competent evidence to justify its action."

Also, in Ahern v. Board of Equalization, 160 Neb. 709, 71 N. W. 2d 307, this court reaffirmed that: "The presumption that a board of equalization in making an assessment acted upon sufficient competent evidence to justify its action disappears when there is competent evidence on appeal to the contrary, and from that point on the reasonableness of the valuation fixed by the board becomes one of fact based upon evidence, unaided by presumption, with the burden of showing such value to be unreasonable resting upon the party complaining."

In Novak v. Board of Equalization, *supra*, quoting with approval from First National Bank of Blue Hill v. Webster County, 77 Neb. 815, 113 N. W. 190, this court said: " 'The assessment of property for the purpose of taxation as ultimately fixed by the board of equalization is final, except upon appeal to the district court, and should not be disturbed on such appeal unless it appears from clear and convincing proof that it is erroneous.' "

In Woods v. Lincoln Gas & Electric Light Co., 74 Neb. 526, 104 N. W. 931, this court said: "At the outset of the discussion we deem it advisable to say that this court will not usurp the functions of the tribunals created by law for ascertaining the fair cash value of property for taxation, and will not constitute itself a taxing board or board of equalization." Such case also affirmed generally that the values of property made by the proper assessing officials are presumed to be correct and the burden of proof is on those attacking the same to show that it should be assessed at a different rate.

As a general rule the valuation of property for tax purposes by the proper assessing officers should not be overthrown by the testimony of one or more interested witnesses that the values fixed by such officers were excessive or discriminatory when compared with values placed thereon by such witnesses. Otherwise, no assessment could ever be sustained.

In State ex rel. Bee Building Co. v. Savage, *supra*, quoting with approval from Maish v. Arizona, 164 U. S. 599, 17 S. Ct. 193, 41 L. Ed. 567, this court said: " '* * * it would be strange, indeed, if an assessment could be set aside because a single witness is found whose testimony is that the valuation was excessive. No assessment, could be sustained if it depended upon the fact that all parties thought the valuation placed by the assessing board was correct. Something more than an error of judgment must be shown, something indicating fraud or misconduct. * * * It is unnecessary to determine whether this board erred in its judgment as to the value of this property, whether it would not have been better to have made further examination and taken testimony as to the cost of construction, present condition, etc. Matters of that kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment can not be overthrown. Pittsburg, C., C. & St. L. R. Co. v. Backus, 154 U. S. 421, 435.' "

A comparable situation appeared in Minneapolis Dredging Co. v. Reikat, 141 Neb. 470, 3 N. W. 2d 889, wherein we said: "Testimony of this nature did not necessarily disprove the valuation fixed by the county board of equalization nor conclude the district court on that issue."

In Reynolds v. Crudgington (Tex. Civ. App.), 266 S. W. 2d 430, *citing numerous authorities and quoting with approval from Hinkson v. Lorenzo Independent School Dist.* (Tex. Civ. App.), 109 S. W. 2d 1008, it is said: " 'The general rule is that an attack of the character here made by appellant upon assessment valuations made by a board

of equalization cannot be justified in the absence of allegations and proof of fraud, or something equivalent thereto, such as lack of jurisdiction, an obvious violation of the law, or the adoption of a principle or method of establishing valuations or making assessments that is fundamentally wrong and which results in a substantial injury to the complainant. Mere differences of opinion, honestly entertained, though erroneous, will not warrant the interference of the courts.' "

In the light of the foregoing applicable and controlling rules we have examined the voluminous record which contains many exhibits, including photographs of all plaintiffs' properties and others involved. We can only summarize pertinent parts thereof. In doing so, we find no competent evidence which could sustain the conclusion of the trial court that properties of frame construction, comparable with plaintiffs' brick veneer or brick veneer and stone properties, were valued by defendants during 1953 at 50 or 60 percent of their actual value while plaintiffs' properties were valued at approximately all of their actual value. As a matter of fact, all of such properties were valued at an almost equivalent average small percent of their actual value. The values were so low that the state board's final order raised all values upon all city and town properties in the county by 139 percent above that fixed by defendants.

The record discloses that in 1950, pursuant to section 77-1301, R. R. S. 1943, defendants employed three residents of the county as a real estate classification and reappraisal committee to examine, classify, and appraise all rural lands and city and town lots in Keith County. The county assessor, who had been such since January 1948, was a member thereof. Another member was a property owner concededly "held very highly" in the county. The other member was a farmer and a property owner in the county of Keith and city of Ogallala. Such committee concededly inspected inside and outside all but a very few of the properties in Ogallala and

other cities and towns in the county. In doing so, they measured and examined the lots and the kind and type of improvements, including houses, garages, and other buildings thereon. They took into consideration the size, age, location, type of building, type of construction, i. e., whether brick, stone, frame, concrete, stucco, or combinations thereof, the type of foundation and joists, roof and electric system, the size and type of basement construction, the kind and quality of heating, plumbing, bathrooms, floors, interior and exterior finish, number of stories and rooms, and the number and type of fireplaces, if any. They separately valued each lot or lots and the improvements thereon. In arriving at the valuation of each property, their primary purpose clearly was to honestly and fairly equalize valuations so that each property would bear its proportionate share of taxation rather than to determine the actual value of each separate property.

In the light of the foregoing elements and others sometimes applicable to particular properties as shown by added remarks and other evidence, the committee made a separate dated written work sheet or report upon each piece of property, which contained a designation and diagnosis of each and all such considered elements aforesaid, together with a sketch or plat describing the lots and buildings thereon and correctly reflecting the dimensions and classifications thereof. Many such work sheets, including those relating to plaintiffs' properties, appear in the record. As shown thereon and otherwise, such committee appropriately classified all property and improvements as class A, B, C, or D, dependent upon all the aforesaid elements considered by them which appear in each separate work sheet. Generally, class A would mean brick or stone improvements valued within a radius of from $6 to $4 a square foot. Class B would generally be frame improvements valued within a radius of from $4 to $2.70 a square foot. Class C would generally be frame improvements valued within

a radius of $2.70 to $1.70 a square foot; and class D would generally be small improvements or those almost worthless, valued within a radius of $1 or less a square foot.

Some such classifications overlapped on particular properties or parts thereof, or in other cases, upon classification and reappraisal, credit would be given because of certain elements or the lack thereof. For example, after the Carl P. Nichols' property had been designated as class A at $5 a square foot, credit for an $800 deduction was given for the type of floor and pine window and door trims which were not quite as good as in some other class A properties.

The committee reports and compilations were returned, filed, and approved as required by law, and thereafter the county assessor, upon the basis thereof and other considerations, generally fixed the valuations of all properties for tax purposes in 1951 at 48.5 percent of the appraisal committee's valuations.

Therefore, as shown by the committee's reports and other evidence, the LeDioyt brick veneer property was classified by the committee as class A at $5 a square foot and was appraised at $9,020, but the assessor fixed its valuation at only $4,475 for tax purposes in 1951. In the same manner, the Scott property was classified as class A at $5 a square foot and was appraised at $13,294, but the county assessor fixed its valuation at only $6,550 for tax purposes in 1951. The Waldo A. Nichols property was classified as class A at $5 a square foot and appraised at $15,206, but the county assessor fixed its valuation at only $7,575 for tax purposes in 1951. The Carl P. Nichols' property was classified as class A at $5 a square foot and appraised at $15,161, but the county assessor fixed its valuation at only $7,455 for tax purposes in 1951. The Welsh property was classified as class A at $6 a square foot and appraised at $16,332, but the county assessor fixed its valuation at only $8,035 for tax purposes in 1951.

With few exceptions unimportant here, such 1951 valuations for tax purposes were carried through 1952 until 1953, when the state board, doubtless having in mind Laflin v. State Board of Equalization & Assessment, 156 Neb. 427, 56 N. W. 2d 469, insisted upon a reappraisal of all real property for tax purposes in Keith and certain other counties in the state. The county assessor as a witness for plaintiffs testified that he then fixed the "actual value" of all such properties. Admittedly in so doing he valued the LeDioyt property at $25,630, but the county board reduced that valuation to $8,950, which the judgment of the trial court rendered herein reduced to $6,265. He valued the Scott property at $37,610, but the county board reduced it to $13,100, which such judgment reduced to $9,170. He valued the Waldo A. Nichols property at $43,860, but the county board reduced it to $15,150, which such judgment reduced to $10,605. He valued the Carl P. Nichols property at $42,740, but the county board reduced it to $14,910, which such judgment reduced to $10,437. He valued the Welsh property at $46,100, but the county board reduced it to $16,070, which such judgment reduced to $11,249.

It will be noted that in each instance the county board in 1953 simply doubled the 1951 valuations, so that in 1953 plaintiffs herein, as well as all other taxpayers, would pay taxes on only 50 percent thereof. They would thus pay taxes based on the same assessed valuation as they did in 1951 and 1952. In such a situation the state board, by its 1953 order, increased all city and town property valuations in Keith County 139 percent above those fixed by the county board, and for the first time these plaintiffs then complained about valuations and discrimination by the county board when it originally fixed their valuations for 1953.

Plaintiffs were all prominent businessmen. They all lived in their own homes in Ogallala. Their homes were the properties directly involved. Each home was re-

cently constructed of brick veneer or brick veneer and stone. They were all located on pavement in more favorable sections of the city. Each home was commodious, generally modern, and expensively finished in every material respect. Plaintiff George E. LeDioyt who was engaged in the real estate, insurance, and loan service business, was the only witness, except the county assessor, who testified for plaintiffs with regard to the actual value of the properties belonging to plaintiffs. All other plaintiffs testified, but ventured no opinion whatever with regard to the actual value of their own or any other taxpayer's property. In doing so, George E. LeDioyt frankly admitted that the valuations of each and all of plaintiffs' properties placed thereon by the county board in 1953 were way below their actual value. Plaintiff George E. LeDioyt admitted that the actual value of the LeDioyt property was $23,000. He admitted that it cost $22,423.60, not including landscaping. One qualified witness estimated that its reconstruction would cost $17,783 without the lot, carpets, or shrubs; another estimated $20,752.33; and another estimated $22,500.

George E. LeDioyt testified that the actual value of the Scott property was $33,000. Plaintiff Robert K. Scott admitted that it cost $37,136.89 not including carpets. One qualified witness estimated that its reconstruction would cost $35,361.15, giving no consideration to fancy finish; another estimated $40,357 without lot, carpets, or shrubs; and another estimated $48,140 including the lot.

George E. LeDioyt testified that the actual value of the Waldo A. Nichols property was $35,000. Plaintiff Waldo A. Nichols admitted that it cost $39,555.95. One qualified witness estimated that its reconstruction would cost $33,997, giving no consideration to fancy finish; another estimated $42,093 without lot, carpet, or shrubs; and another estimated $49,250 including the lot.

George E. LeDioyt testified that the actual value of

the Carl P. Nichols property was $32,000. Plaintiff Carl P. Nichols admitted that it cost him $30,835.94, and he himself performed a substantial part of the labor. One qualified witness estimated that its reconstruction would cost $48,750 including the lot; and another estimated $55,244 without lot or carpets.

George E. LeDioyt testified that the actual value of the Welsh property was $40,000. Plaintiff David A. Welsh admitted that it cost $38,650.90. One qualified witness gave his estimate that its reconstruction would cost $58,616 without lot or carpets; another estimated $51,600 including the lot.

None of the plaintiffs who testified about the cost of their respective properties could produce complete competent records to support their conclusions. The qualified witnesses aforesaid had inspected each of plaintiffs' properties inside and out. They generally classified plaintiffs' properties as grade A or AA, and estimated that the first-class, well-constructed, grade A LeDioyt property would cost $12 a square foot; that the more excellently constructed grade AA Scott property would cost $20 a square foot; that the better grade AA Waldo A. Nichols property would cost $16 a square foot; that the better grade AA Carl P. Nichols property would cost $16 a square foot; and that the best grade AA Welsh property would cost $22 a square foot. Concededly, the construction of such brick veneer or brick veneer and stone properties would cost from 5 to 15 percent more with less upkeep than frame properties, and loan companies would loan about 10 percent more on such properties than on frame properties. However, a witness for plaintiffs testified that identical frame and brick properties in Ogallala would then sell at about the same price.

We conclude that the values placed upon plaintiffs' properties by the county board in 1953 were in fact but little if any more than one-third of their actual values, whether measured by the actual values placed thereon

by plaintiffs' witness George E. LeDioyt or their witness the county assessor or by other witnesses who testified with relation to the construction or reconstruction cost. The trial judge's judgment herein reduced such values to little if any more than one-fourth of their actual values.

The related question remaining then is whether or not plaintiffs and their brick veneer or brick veneer and stone properties were arbitrarily and intentionally discriminated against by the county taxing officials, because, as claimed by plaintiffs, the tax values placed upon their properties were higher than those placed upon certain other allegedly comparable frame properties, and they were thus required to bear an unequal proportion of tax burdens. We conclude that they were not.

Plaintiffs, in attempting to establish that they and their brick properties were so discriminated against, also offered evidence with reference to 10 other alleged comparable brick veneer properties in Ogallala. Photographs of all such properties appear in the record. George E. LeDioyt, who was a greatly interested witness and as the only witness for plaintiffs with reference thereto, gave his own opinion with regard to the actual value of each such properties on March 10, 1953, and compared that value with each valuation placed thereon by the county board in 1953. Thereby, as was done with relation to plaintiffs' properties, he attempted to theoretically establish that a high percentage of value for tax purposes had been placed upon brick veneer properties when compared with the witnesses' own opinion of their value. George E. LeDioyt's valuation of two such properties was predicated upon sales thereof in 1951. One such valuation was predicated upon a sale in 1952, and one was predicated upon a sale in 1953. In that regard, LeDioyt conceded that sale prices did not always fix actual value, and one sale made in 1951 upon which he relied graphically illustrated that fact. LeDioyt admitted also that he had not examined all the county records, but knew that many properties, includ-

ing frame buildings in Ogallala and Keith County, were assessed at actual value, or for approximately 100 percent or more of their sale value in 1953.

Likewise, George E. LeDioyt gave his opinion with regard to the actual value of some 17 frame properties out of approximately 1,000 in Ogallala which he claimed were comparable with plaintiffs, in order to theoretically arrive at a percentage of assessed value when compared with his own opinion of value. Based upon Le-. Dioyt's opinion with regard to actual values thereof when compared with the respective values placed thereon by the county board for tax purposes, he attempted to establish that the percentage relationship was lower than that arrived at by use of the same process with regard to brick veneer or brick veneer and stone properties. In other words, he apparently fixed the actual value of brick veneer or brick veneer and stone properties low enough so that the percentage relationship would be high, and fixed the value of frame properties high enough so that the resulting percentage would be lower. Some of his values of frame properties were based on sale prices for the years 1945, 1946, 1948, 1951, and 1953. Only four of such sales were in 1953, the year involved. The unreliability of such comparisons are illustrated by the value placed by LeDioyt upon the so-called Saathoff property located across the street from his own property. His valuation placed thereon was $35,000, which was $12,000 greater than that placed by him upon the LeDioyt property, $2,000 greater than that placed by him upon the Scott property, and $3,000 greater than that placed by him upon the Carl P. Nichols property. His valuation placed upon the Saathoff property was identical with that placed by him upon the Waldo A. Nichols property, and only $5,000 less than that placed on the Welsh property. Photographs of all 17 properties aforesaid, together with photographs of plaintiffs' properties, appear in the record. An examination and comparison of such photographs, together with other evi-

dence in the record, clearly refutes the accuracy and credibility of George E. LeDioyt's valuations and computed percentages. Further in that regard, George E. LeDioyt had not been inside some of the frame improvements on such properties for years or for a considerable length of time, and when he had been inside them it was not for the purpose of establishing values thereon, and he was not generally familiar with their manner or type of construction, equipment, or interior finish.

On the other hand, the county assessor testified as a witness for defendants that he made an examination of the county deed records of all sales of real estate, including brick veneer, stucco, metal, and frame constructed properties in Ogallala during 1953. He compiled a description of each such properties and improvements thereon if any together with the consideration paid therefor. Therein he then noted the actual values placed thereon for tax purposes by defendants and compared such values with the sale prices in order to arrive at their percentage relationship. Also, in like manner the assessor compiled a list of all deed record sales of rural property in the county in 1953. Further, a like compilation was made by him with reference to all 1953 sales of property in other towns in the county. We conclude that such compilations and other competent evidence appearing in this record support defendants' contention that they did not intentionally overvalue plaintiffs' properties or discriminate against plaintiffs or their properties as claimed by them.

There is no competent evidence which could sustain a conclusion that any of the defendant tax officials of Keith County acted in bad faith or were animated by any improper, fraudulent, or corrupt intentional violation of law or duty or the essential principles of practical uniformity. They may in some instances have made mere errors of judgment, but that alone will not support a claim of discrimination. On the other hand, we recog-

nize factually and legally that good faith approximation by defendants both as to value and uniformity in assessing real property for tax purposes is all that is constitutionally required.

We conclude that plaintiffs failed to establish, in the manner required, that their properties were overvalued for tax purposes, or that plaintiffs or their properties were discriminated against in violation of their constitutional rights.

Therefore, we conclude that each and all of the respective judgments rendered by the trial court should be and hereby are reversed, and each and all such five actions should be and hereby are dismissed. All costs in the district court and this court are taxed to plaintiffs.

REVERSED AND DISMISSED.