**CENTRAL MAINE POWER COMPANY**

v.

**TOWN OF MOSCOW.**

Supreme Judicial Court of Maine.

Argued June 7, 1994.

Decided Oct. 26, 1994.

James R. Erwin (orally), James G. Good, Catherine R. Connors, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

James Buckley, Me. Public Utilities Com'n, Augusta, for amicus curiae.

Wayne R. Jortner, Office of Public Advocate, Augusta, for amicus curiae.

Peter M. Beckerman (orally), Waterville, for defendant.

Richard P. Flewelling, Maine Municipal Ass'n, Augusta, for amicus curiae.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

■ Central Maine Power Company (CMP) appeals from a judgment entered in the Superior Court (Kennebec County, *Crowley, J.*) affirming a decision of the Board of Property Tax Review as to the property tax assessment imposed by the Town of Moscow for 1989 on a portion of CMP's W.S. Wyman Hydroelectric Project (Wyman). On appeal, CMP contends that the Board improperly deferred to the municipal assessors and also erred by failing to take into account the effect of regulation by the Public Utilities Commission (PUC) on Wyman's fair market value. Discerning no error, we affirm the judgment.

The record as developed before the Board reflects that the 80–megawatt Wyman project, located on the Kennebec River, began commercial operation in 1930. Part of the project's dam is located in the Town of Moscow; the project's generating facilities and the remainder of the dam are located in Pleasant Ridge Plantation. At issue in this proceeding is the Town of Moscow's valuation of that part of the hydroelectric project itself that lies within the Town; CMP does not contest the Town's separate assessment of the real estate upon which the project stands.

As of April 1, 1989, the Town assessed the property at issue at $49 million.[1] The Town's appraiser, Robert Taylor, reached this estimate of fair market value by using as "primary indicators" his calculations of Wyman's "replacement value" and its "going concern value," the latter defined as "the difference in value of an operating concern and the value of the physical assets alone." Taylor estimated that the replacement value fell between $44,650,000 and $60,724,000, with an additional 10 to 20 percent to be added to reflect Wyman's going concern value.

The Town's appraiser rejected as having "limited use" an assessment methodology used by the PUC to value the property for utility ratemaking purposes. Pursuant to 35–A M.R.S.A. § 303 (Supp.1993),[2] the value of Wyman for ratemaking purposes was $970,030. This figure, referred to as Wyman's "net book cost," represents the amount on which the PUC permits CMP to receive a return on investment from the utility's ratepayers.[3] Wyman's low valuation for ratemaking purposes results from the number of years that it has been in service. Over the approximately sixty years since the project went on line, CMP has almost completely recovered from its ratepayers its original investment in Wyman and, in the interim, has recovered a fair return on the unrecovered portion of the investment pursuant to section 303.

The Town's assessors adopted the recommendations of the appraiser, and from their assessed valuation of $49,000,000 CMP sought an abatement. Pursuant to 36 M.R.S.A. § 842 (Supp.1993), the Town's failure to act on CMP's request within sixty days was deemed to be a denial of the abate-

---

1. The Town's appraiser valued the entire Wyman project at $150 million, of which approximately one third was attributed to the property taxable by the Town. The appraisal figures discussed in the text of this opinion refer only to the portion of the property within the Town.

2. 35–A M.R.S.A. § 303 (Supp.1993) provides that:

   In determining just and reasonable rates, tolls and charges, the [PUC] shall fix a reasonable value upon all the property of a public utility and upon an electric plant to the extent paid for by the utility on the premises of any of its customers, which is used or required to be used in its service to the public within the State and a fair return on that property. In fixing a reasonable value, the commission shall give due consideration to evidence of the cost of the property when first devoted to public use and the prudent acquisition cost to the utility, less depreciation on each, and any other material and relevant factors or evidence, but the other factors shall not include current value. In making a valuation, the commission may consult reports, records or other information available to it in the office of any state office or board.

3. The Town disputed the calculation of Wyman's net book cost, which was supplied by CMP. The PUC has not contested CMP's calculations and, in any event, the exact calculation of Wyman's net book cost is not at issue in this appeal.

ment. Thereafter, pursuant to 36 M.R.S.A. § 844(2) (1990), governing nonresidential properties whose valuation exceeds $500,000, CMP appealed the Town's assessment to the Board. After four days of hearings at which experts for the Town, CMP and the PUC testified, the Board affirmed the decision of the assessors. Pursuant to M.R.Civ.P. 80C, CMP then brought a complaint seeking judicial review of the Board's decision in the Superior Court. From the Superior Court's decision affirming the Board, CMP filed this appeal. Because the Superior Court acted in an appellate capacity in reviewing the determination of the Board, we review the decision of the Board directly for abuse of discretion, errors of law, or findings unsupported by substantial evidence in the record. *Town of Vienna v. Kokernak,* 612 A.2d 870, 872 (Me. 1992) (reviewing grant of tax abatement by county commissioners).

### I. The Board's Standard of Review

█ In its written decision, the Board stated that the determination of the municipal assessors enjoys "the presumption of validity" which CMP could overcome only by proving that the challenged valuation was "manifestly wrong." CMP's contention is that the Board erred as a matter of law by improperly deferring to the municipal assessors and by not reviewing the assessment *de novo.* The Town maintains that the burden of proof was properly allocated to CMP at the Board level.

When a taxpayer challenges the assessment of nonresidential property with a municipal valuation exceeding $500,000, appeal from the municipal determination is to the Board of Property Tax Review. 36 M.R.S.A. §§ 843(1–A), 844(2) (Supp.1993). As with other modes of administrative review of municipal assessment, the taxpayer must receive a "reasonable abatement" if the Board "thinks that the owner is over-assessed." §§ 843(1–A), 844(2); *see also* 36 M.R.S.A. § 843(1) (Supp.1993) (governing appeals to municipal boards of assessment review); 36 M.R.S.A. § 843(2) (Supp.1993) (governing appeals to State Board of Property Tax Review of municipal determinations in primary assessing areas); 36 M.R.S.A. § 844(1) (Supp. 1993) (governing appeals to county commis-

sioners). Unique to the provision governing nonresidential property valued at $500,000 or greater, however, is the requirement that "[t]he board shall hold a hearing de novo." *Id.* § 843(1–A).

We cannot agree with CMP that the language mandating a hearing *de novo* requires the Board to accord no deference to the determination of the municipal assessors. In the context of sales taxes, we have previously drawn a distinction between a *de novo hearing* and a *de novo determination,* noting that the issues to be considered in a *de novo* hearing may be limited and may involve some degree of deference to the previous determination. *See Jackson Advertising Corp. v. State Tax Assessor,* 551 A.2d 1365, 1366 (Me.1988).

A review of the legislative record demonstrates that the intent of section 843(1–A) is to require a *de novo* hearing before the Board without mandating a *de novo* determination. The Legislature created the present Board in 1986, *see* P.L.1985, ch. 764, §§ 2, 8, 17, and charged it with the same standard of review that applies when a local board of assessment review or county commissioners review a decision of the assessors, i.e., the reviewing agency shall grant a reasonable abatement if the agency "thinks that the owner [or applicant] is over-assessed." *Id.* §§ 17, 18; 36 M.R.S.A. §§ 843(1), (1–A), 844. The Statement of Fact accompanying this legislation makes clear that the reference to *de novo* review in section 843(1–A) goes not to the standard of the Board's review, but rather to the legislature's intention that the Board not rely on the record as developed by a local board of assessment review if such a local board has reviewed the assessment. *See* L.D. 2364, Statement of Fact (112th Legis.1986) (when Board hears appeal of assessment that has already been reviewed by local board of assessment review, Board shall hold *de novo* hearing and "determine the matter in the same manner as if the appeal had been taken directly from the assessors' decision or municipal officers' decision on the abatement application to the state board"). Thus, we conclude that the legislature did not intend the language in section 843(1–A) to alter the previously existing law governing the stan-

dard of review to be applied when a reviewing agency "thinks that the owner is over-assessed." [4]

■ We have repeatedly stated that a taxpayer seeking to challenge a property tax assessment has the burden of proving that:

(1) The judgment of the assessors was irrational or so unreasonable in light of the circumstances that the property is substantially overvalued and an injustice results;

(2) There was unjust discrimination; or

(3) The assessment was fraudulent, dishonest, or illegal.

*Kokernak*, 612 A.2d at 872 (citing *Moser v. Town of Phippsburg*, 553 A.2d 1249 (Me. 1989); *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 393 (Me.1981); *Delta Chemicals, Inc. v. Town of Searsport*, 438 A.2d 483 (Me.1981)). In arguing that the Board applied the wrong standard of review in this case, CMP relies on our observation elsewhere in *Kokernak*, and in *Dodge v. Town of Norridgewock*, 577 A.2d 346 (Me. 1990), that when county commissioners act as an appeals board for a municipal tax assessment, the statute "requires that the commissioners give no deference to the decision of the tax assessors." *Kokernak*, 612 A.2d at 873 (citing *Dodge*, 577 A.2d at 347). In neither case, however, were we squarely presented with the question of what burden the taxpayer bears in appealing a property tax assessment to an agency empowered to grant an abatement if the agency "thinks that the owner is over-assessed." In *Kokernak* we held that the Superior Court erred by ignoring the determination of the county commissioners and reviewing the assessors' decision directly. *Kokernak*, 612 A.2d at 872–73. In *Dodge*, administrative review was not an issue. We found no abuse of the Superior Court's discretion in refusing to issue a declaratory judgment to the effect that a municipality should give written reasons for denying an abatement; dispositive was the fact that, at the time of the Superior Court decision, the abatement request was then on appeal to the county commissioners, who had the authority to make their own determination. *Dodge*, 577 A.2d at 347. Thus, neither the holding in *Dodge* nor in *Kokernak* alter the principle that a taxpayer who pursues an administrative appeal of a municipal tax assessment carries the burden of proof before the appellate agency.

■ In its written decision, the Board properly relied on our holding in *Delta Chemicals*, that a taxpayer meets this burden by proving that the assessed valuation of the property, in relation to its just value, is "manifestly wrong." *Delta Chemicals*, 438 A.2d at 484. CMP contends that this is an outdated standard because we articulated it at a time when a taxpayer was required to seek abatements before the courts rather than an administrative tribunal. The notion that municipal assessments must stand unless "manifestly wrong" first appears in *Shawmut Mfg. Co. v. Town of Benton*, 123 Me. 121, 131, 122 A. 49 (1923), in which a municipal assessment was reviewed first by the county commissioners, *id.* at 122, 122 A. 49, and then by the Law Court following testimony apparently taken by a single justice. *See id.* at 131, 122 A. 49. We subsequently charged taxpayers with the same burden of proof in cases when there had been no intermediate agency review. *See Spear v. City of Bath*, 125 Me. 27, 29–30, 130 A. 507 (1925); *Sweet v. City of Auburn*, 134 Me. 28, 33, 180 A. 803 (1935); *Sears, Roebuck & Co. v. City of Presque Isle*, 150 Me. 181, 186, 107 A.2d 475 (1954); *Delta Chemicals*, 438 A.2d at 484. The Board properly allocated to CMP the burden of proving that the Town had over-assessed the Wyman project.

## II. The Effect of PUC Regulation on Assessment of Utility Property

Maine's Constitution requires that property be assessed for purposes of taxation "equally according to the just value thereof." Me. Const. art. IX, § 8. CMP contends that the assessment adopted by the Town and

---

4. In fact, the legislature considered but ultimately failed to enact a proposal from the 1985 Speaker's Select Committee on Property Tax Reform to have highly valued utility properties assessed entirely at the state level. *See* L.D. 2165 (112th Legis.1986). Permitting the Board to ignore the determination of the local assessors would have the effect of vesting this assessment authority at the state level despite the legislature's failure to adopt such an approach.

affirmed by the Board amounts to legal error because the assessment methodology failed to take into account the effect of PUC regulation on the property's just value. According to CMP, the PUC would use its authority to prevent CMP from ever selling Wyman to another regulated utility at anything greater than net book cost, and would veto a sale to an unregulated entity unless the sale price were great enough to permit CMP to replace Wyman's power output, a price that would be impossible for any rational market participant to pay. Accordingly, CMP contends that net book cost is the only possible measure of the property's just value, and the Board was therefore compelled to assess Wyman at its "net book cost" of $970,000.

In support of its position, CMP points out that the PUC has statutory authority both to prevent a utility from selling any utility property "that is necessary or useful in the performance of [the utility's] duties to the public," 35–A M.R.S.A. § 1101(1)(A) (1988), and to prevent a utility from taking out of public service "all or part of its plant, property or system necessary or useful in the performance of its duties to the public." *Id.* § 1104. In testimony before the Board and again in an *amicus* brief filed with this Court, the PUC agrees with CMP that it is highly unlikely that the Commission would ever approve the sale of Wyman to a nonregulated entity that would then take the hydroelectric project out of public service. The PUC's expert testified before the Board that replacement power would cost CMP ten times the current cost of Wyman power; thus, the PUC contends, it would approve a sale of Wyman to a nonregulated entity only at a price high enough to allow CMP to cover the cost of replacement power, a price the expert testified would be "clearly beyond the realm of possibility." The PUC also agrees that the effect of regulation would preclude another utility subject to PUC regulation from purchasing Wyman at anything greater than net book cost. This is because the ratepayers have already paid for Wyman's original cost and the PUC would therefore prevent the purchaser from earning a return on any investment greater than net book cost. *See, e.g., Re Hampden Telephone Co., Proposed Purchase of Lincoln Telephone Co.,*

No. 82–118 (Me. P.U.C. Dec. 30, 1982). As the PUC noted in the *Hampden Telephone Co.* case, to do otherwise would be to force ratepayers "to pay twice for the same assets solely by virtue of a change in ownership of the assets." *Id.* at 2.

■ This limit on the return that an owner of such a utility property may earn on its investment is a factor that should be taken into account in the valuation of such a property for tax purposes. *See Kittery Elec. Light Co. v. Assessors of Kittery,* 219 A.2d 728, 737 (Me.1966). But this does not compel a municipal assessor, or an administrative agency reviewing the determination of a municipal assessor, to value the property using the same methodology as the PUC does for ratemaking purposes. In general, " 'local assessors [have] considerable leeway in choosing the method or combinations of methods to achieve just valuations.' " *South Portland Assocs. v. City of South Portland,* 550 A.2d 363, 366 (Me.1988) (quoting *Shawmut Inn,* 428 A.2d at 390). In *Kittery Elec. Light Co.,* we affirmed the denial in part of a request for an abatement to a utility where the local assessors had refused to value the property at net book cost, *Kittery Elec. Light Co.,* 219 A.2d at 744, rejecting the taxpayer's argument that the assessors were compelled to use that assessment methodology. *Id.* at 737.

> [B]lind adherence to or automatic adoption of the public utility commission's valuations by the assessors in the exercise of their functions would undoubtedly be not only neglect of their duties but a flagrant disregard of the constitutional mandate [to tax property according to its just value].
>
> The value of property for tax purposes and its value for rate-making purposes need not be the same.
>
> . . . .
>
> The duty to ascertain the just value for taxation purposes of the property of public utilities has been placed upon the assessors by law ... and not on the Public Utilities Commission.

*Id.* at 735 (citations omitted).

In that case, we did recognize that "[t]he reasonably foreseeable prospects of [PUC]

approval of sale or rate increases are considerations affecting the market value of property of public utilities." *Id.* at 737. In its decision, the Board addressed CMP's argument that there could be no market sale of the dam. The Board's decision reflected a conclusion that such a sale was "not beyond the likelihood of reality." CMP contends that the language in the Board's decision impermissibly allocates to a utility in an assessment case a "nearly insurmountable burden" of proving "no possibility of a market rate sale." CMP would be correct if the Board had been making a *de novo* determination of Wyman's just valuation and, as its sole basis for *de novo* deciding against CMP, had concluded that CMP failed to prove that there was no possibility that the property could be sold at a higher price than CMP's proposed valuation at net cost. Such is not the case, however. The Board's decision makes clear that it was fully aware of our decision in *Kittery Elec. Light Co.* that CMP's status as a regulated utility is a factor that has to be considered in assessing its property, but emphatically not automatically determinative of the facility's just valuation.

The Board was also aware that the Town's assessment was not based solely on a possible but highly unlikely market sale of the dam. The Town's assessor used as his "primary indicators" his calculation of the facility's replacement value and its going concern value, with reference to the cost to CMP of replacing Wyman's power from four alternative sources, and used five other calculations as a "check" on his primary indicators.[5] The decision refers to these various "methods of valuation" used by the Town and its appraiser. We disagree with CMP's contention that the views of the appraiser are "irrelevant" in light of Wyman's status as a PUC-regulated property.

One particularly useful assessment methodology, used by the appraiser as a "check" on his primary indicators, is the "reproduction cost less depreciation" method. This method yielded an estimate of $57,094,000 for the value of that part of Wyman within the Town of Moscow. Reproduction cost less depreciation, also commonly referred to as the "cost" approach to valuation, is a method of assessing real estate. *Shawmut Inn,* 428 A.2d at 392. Such a valuation method has relevance in the determination of a utility property's just valuation. The calculation of the property's replacement value need not necessarily replicate the PUC's calculation, based on similar considerations, of the property's net book cost. As the New Jersey Supreme Court noted in *Transcontinental Gas Pipe Line Corp. v. Bernards Township,* 111 N.J. 507, 545 A.2d 746 (1988), replacement cost may greatly exceed net book cost in these circumstances because the life of a generating plant may greatly exceed the period of time during which a utility may be allowed to depreciate its property. *Id.* 545 A.2d at 759. A key aspect of the "cost" method is that it captures for property tax purposes the difference between the replacement value and the net book cost, a sum that the New Jersey court refers to as the property's "residual value." *Id.* As that court noted, because the utility's owners cannot recover anything on this residual value, this value is "properly attributed to the ratepayers," *id.,* because, "[w]hile an investor would not pay for this residual value ... the ratepayers would definitely pay to replicate this capacity if by chance the [facility] were to be destroyed." *Id.* at 760. Similarly, the Supreme Judicial Court of Massachusetts has observed that in a dispute such as this one,

---

5. The alternative power sources considered by the appraiser were the construction of a new coal-fired electrical power plant, the construction of an oil-fired plant, the wholesale purchase of power from Hydro–Quebec, and replacement of Wyman's capacity through "avoided cost" measures, i.e., by reducing the demand for CMP power. For the entire Wyman project, these estimates ranged from a high of $164 million for the Hydro–Quebec purchase to a low of $121 million for a new oil-fired plant. The appraiser estimated that the facility's "going concern" val-

ue amounted to an additional 10 to 20 percent to the facility's value, and thus he reached his estimate that Wyman's just valuation is $150 million. As a "check" on the primary indicators, the assessor calculated the plant's original cost, its original cost less depreciation, its earnings value, its reproduction cost, and its reproduction cost less depreciation. These figures ranged from $6,256,000 for original cost less depreciation to a reproduction cost estimated at $191 million.

the "true contestants" are not the utility and the municipality but

> local taxpayers and consumers of electricity. If [the utility] pays more in local property taxes, that amount is reflected in [the utility's] rate to its customers, and other local taxpayers pay less. The lower [the utility's] local taxes, the lower its rates to its customers and the higher the local tax burden on other taxpayers. . . .

*Boston Edison Co. v. Bd. of Assessors of Watertown,* 387 Mass. 298, 439 N.E.2d 763, 769 (1982). Thus, the question whether a municipality should not be permitted to tax the residual value of an electrical generating facility is fundamentally a policy determination.

Our review is limited to whether the record in this case supports the Board's determination that the assessment adopted by the Town was not manifestly wrong, and whether the Board committed legal error or abused its discretion in reaching that determination. The root of CMP's objection to the valuation proposed by the Town's appraiser, adopted by the Town and ultimately affirmed by the Board, lies in the implicit contention of CMP that Wyman's residual value should not be included in the property's valuation for property tax purposes. Such a question is the province of the legislature. The Board's determination is supported in the record, and we find no error or abuse of discretion in its decision.

The entry is:

Judgment affirmed.

WATHEN, C.J., and ROBERTS, GLASSMAN and DANA, JJ., concurring.

LIPEZ, Justice, dissenting, with whom RUDMAN, Justice, joins.

I must respectfully dissent from the Court's opinion. Article IX, § 8, cl. 1 of the Maine Constitution states: "All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." "Just value" means market value. *Sweet v. City of Auburn,* 134 Me. 28, 31, 180 A. 803, 804 (1935). In an appraisal report prepared for the Town of Moscow, Robert G.

Taylor acknowledges this principle: "The valuation determined for this appraisal is based on the Fair Market Value of the properties." He further defines fair market value in familiar terms: "Fair market value as utilized in this appraisal is defined as the amount a willing buyer would pay and a willing seller would accept where both have reasonable knowledge of all relevant facts and neither is under compulsion to enter into the transaction."

As we stated in *Shawmut Inn v. Town of Kennebunkport,* there are "at least three standard appraisal methods of determining the market value of real property: 1) the 'comparative' or 'market data' approach, 2) the 'income' or 'capitalization' approach, and 3) the 'reproduction cost less depreciation' or 'cost' approach." 428 A.2d 384, 390 (Me. 1981). Although one of these approaches uses the word "market" descriptively, all three approaches are intended to assist an assessor in determining market value—what a willing buyer would pay and a willing seller would accept. Just value does not exist in a vacuum. It requires the reality of a market where there is a reasonable probability of a sales transaction: "Whatever factors are based upon a reasonable probability existing at the time of the assessment, as opposed to pure speculation, are relevant on the question of value." *Kittery Elec. Light Co. v. Assessors of Town,* 219 A.2d 728, 737 (Me. 1966) (quoting *McKnight Shopping Ctr., Inc. v. Board of Property Assessment, A & R,* 417 Pa. 234, 209 A.2d 389, 393 (1965)).

The Court goes astray by affirming a State Board of Property Tax Review decision which, reduced to its essence, sanctions an appraisal of the Wyman Dam that is based on possibilities of sales so remote that the market described is a fiction. Thus premised, the Town's appraisal was "manifestly wrong," and the evidence before the Board compelled that conclusion.

Although Taylor testified about the possibility of a sale of the Wyman Dam to the Massachusetts Municipal Wholesale Electric Company (MMWEC) and to non-utility generators (NUGs), his testimony does not withstand scrutiny. Legally, financially, prac-

tically, a sale to MMWEC could never happen. Taylor himself could not cite a single example where a functioning property like Wyman had been sold out of the rate base of a utility to a non-utility. The reason for his inability is well-stated in the amicus brief filed by the Maine Public Utilities Commission and the Office of the Public Advocate:

> In order for the Commission to approve the sale of useful utility property to a non-regulated utility, the price received by the utility would need to be at a level that would allow the utility to replace such useful property, with property capable of generating electricity at the same cost and with the same or lower risk of future increases in costs, including fuel costs, maintenance costs and environmental costs. In this case, such a price would necessarily reflect that power in replacement for Wyman Dam would cost approximately ten times the cost of power produced by the dam.... Such a price is clearly beyond the realm of possibility.... Moreover, it is inconceivable that any non-hydro electric facility could provide the same operational or future cost reliability as the Wyman Dam.

Testimony to this effect was presented to the Board by Dr. Thomas Austin, then Finance Director of the PUC. This testimony was never refuted. Indeed, Taylor appeared to agree with it. That is a telling concession. Testimony about sales that will never take place because of PUC regulation has little value.

By statute, the assessors in their determination of just value "must consider all relevant factors, including without limitation, the effect upon value of any enforceable restrictions to which the use of the land may be subjected, current use, physical depreciation, functional obsolescence, and economic obsolescence." 36 M.R.S.A. § 701–A (1985). Case law invoked by the Board as the touchstone for its decision makes the similar point that "[t]he likely influence on the market of the department's [the Massachusetts Department of Public Utilities] rate making rules cannot disappear. The department's views are of continuing importance." *Boston Edison Co. v. Board of Assessors,* 402 Mass. 1,

520 N.E.2d 483, 490 (1988). We made the same point in *Kittery Elec. Light:* "The reasonably foreseeable prospects of commission approval of sale or rate increases are considerations affecting the market value of property of public utilities." 219 A.2d at 737. Although the Board pays lip service to these statutory and case law directives, it wholly disregards them with its insupportable deferral to the assessor's claim of a possible sale to an unregulated utility. Indeed, the Board does not even acknowledge the obligation of the Town to discount the value asserted by Taylor in light of the remoteness of the sale possibilities described by him. "If property is known to be subject to a deed restriction or to a governmentally-imposed restriction affecting its value or its earning power, that fact should be considered in any determination of its fair cash value." *Boston Edison Co. v. Board of Assessors,* 387 Mass. 298, 439 N.E.2d 763, 767 (1982).

In its decision, the Board concluded that "the Town's methods of valuation of the property are not 'manifestly wrong.'" The Board further concluded that CMP had "failed to prove the methods utilized by the Town in valuing the property to have been performed improperly." Noting this reference by the Board to multiple methods of valuation, the Court asserts that "the Town's assessment was not based solely on a possible but highly unlikely market sale of the dam." In further support of this conclusion, the Court notes Taylor's analysis of replacement value for the Wyman Hydro-electric Project and his use of "primary indicators" to check this value.

There is confusion here between methods of valuation and market value. The particular method of valuation chosen by an assessor is irrelevant if there are no willing sellers and buyers who would use that particular method of valuation. Replacement value is one method of determining market value if there is a market. Under the applicable legal standard of reasonable probability, a possible but highly unlikely market sale is an inappropriate subject for any method of valuation.

I recognize the difficult issues posed by the valuation of utility property. I recognize

the well-established principle that "[t]he value of property for tax purposes and its value for rate-making purposes need not be the same." *Kittery Elec. Light,* 219 A.2d at 735 (citing *Public Service Co. of N.H. v. New Hampton,* 101 N.H. 142, 136 A.2d 591, 597 (1957)). I understand that "[t]he market value of single purpose property must be determined by consideration of all factors calculated to influence an assumed buyer and seller in reaching a fair price in a free market." *Id.* at 737. I also understand that the resort to an assumed buyer and seller does not dispense with a fundamental tenet of the just value exercise—the reasonable probability of a transaction between the assumed seller and buyer in a real market. The market described by the Town and the Board does not exist.

The Court notes in its opinion that the assessment of utility property raises policy issues that may have to be addressed by the Legislature. I agree. Until that happens, however, I believe we must accept the logic of the well-established principles of just valuation as they apply to utility property even if that logic produces uncomfortable results. The Town and the Board avoided that logic by creating a fictional market for the Wyman Dam. That evasion was essentially a policy decision that despite the applicable constitutional and statutory provisions, utility property will be assessed by a different legal standard. The Court's decision affirms the very type of policy choice it seeks to avoid.

Our principles of deference to the decisions of local officials and state boards are important. They reflect respect for the expertise of other government officials and a recognition that time and resources are limited. Those principles, however, must not prevent us from seeing when the formulaic conclusions of a state board reflect legal error and insubstantial evidence. I fear those principles of deference have clouded the Court's view in this case.

I would vacate the decision of the Board and remand for a redetermination of the assessment of the Wyman Dam.