MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2021 ME 35
Docket:       Som-20-241
Argued:       April 8, 2021
Decided:      July 6, 2021

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, and HORTON, JJ.

MADISON PAPER INDUSTRIES

v.

TOWN OF MADISON

HORTON, J.

[¶1]  Madison Paper Industries (MPI) appeals from a judgment of the Superior Court (Somerset County, *Mullen, C.J.*) affirming a decision of the State Board of Property Tax Review that upheld the Town of Madison's denial of MPI's request for a property tax abatement for the 2016-17 tax year.  MPI argues that the Town's property tax assessment substantially overvalued MPI's paper mill and hydro-electric power plants (hydros) and that the Board made several errors of law in upholding the Town's denial of MPI's abatement request.  Because the Board made no errors of law and because its findings were all supported by competent evidence in the record, we affirm the judgment.

## I. BACKGROUND

[¶2]   As of April 1, 2016, the beginning of the tax year at issue,[1] MPI owned and operated a paper mill in Madison and two hydros that straddle the border of Madison and Anson.  The Town issued a property tax assessment based on its determination of the taxable value of the mill and the Madison portion of the hydros as of that date.  *See* 36 M.R.S. § 708 (2021). MPI requested a tax abatement, which the Town's Board of Assessors denied.  MPI appealed the denial to the State Board pursuant to 36 M.R.S. § 843(1-A) (2021).  After holding a hearing, the Board issued a written decision upholding the denial of the abatement request.  In its decision, the Board made the following findings of fact, which are supported by competent evidence in the record.  *See Angell Fam. 2012 Prouts Neck Tr. v. Town of Scarborough*, 2016 ME 152, ¶ 3, 149 A.3d 271.

### A.    The Mill and Hydros

[¶3]   MPI was a partnership between UPM-Kymmene Corporation (UPM), a global paper products manufacturer, and the New York Times Company.  MPI had purchased the mill property, including the two hydros, to

---

[1]  By statute, the property tax year in Maine runs from April 1 to April 1, and municipal assessors fix the value of property as of April 1 each year for purposes of the tax year beginning on that date. *See* 36 M.R.S. § 502 (2021).

produce super-calendared paper (SC) for the New York Times. The MPI mill was the only SC-manufacturing mill UPM owned in North America and was producing 12 percent of North America's entire SC supply. MPI's mill assets included the mill premises, the paper-making machinery, and the equipment for producing the mechanical pulp used in the production of SC paper.

[¶4] In 2016, UPM and the New York Times dissolved MPI, announcing the dissolution that March. Operations at the mill ceased in May 2016. However, the decision to shut down the mill was made no later than October 2015.

[¶5] As of April 1, 2016, the mill and the two hydros were fully operational. The hydros produced roughly 40 percent of the energy that the mill used, thereby saving the mill money as an avoided cost on energy purchases. MPI purchased on the market the remaining 60 percent of the energy required to operate the mill. Because the hydros straddle the border of Madison and Anson, the Town's valuation split the allocation of the "overall value" of each hydro between the two towns. Each town was allocated roughly 91 percent of one hydro and 19 percent of the other.

[¶6] The mill had been operating at a profit as of April 1, 2016, and it continued to do so until its closure in May 2016. Up to the date it closed, the

4

mill was considered a "state of the art" facility. However, MPI's earnings before interest, taxes, and amortization were in a period of steady decline. By March 2016, UPM and the New York Times had decided that the hydros and mill assets would be sold separately rather than as an operating paper mill complex. In fact, MPI intended that the mill machinery and equipment be sold as scrap separately from the mill premises. MPI advertised the sale of the hydro assets, but neither UPM nor the New York Times nor MPI made any attempt to advertise the sale of the mill assets.

[¶7] After the closure announcement, MPI began receiving bids for the mill assets. The bids were almost exclusively from liquidators who intended only to purchase the assets, not to operate the mill itself. In December 2016, six separate pieces of mill equipment essential for paper production were sold under restrictions that, as expressed in the asset-purchase agreement between MPI and the buyer, prohibited their use in SC production in any location for ten years "to protect the legitimate competitive interests of [UPM] and its Affiliates." These mill assets sold for $2,000,000.

[¶8] MPI sold both hydros in July 2017.

**B.     The Town's Assessment**

[¶9]  Rather than adopting MPI's self-imposed liquidation restrictions for the mill assets, the Town assessed the value of the mill and hydros as "an operating whole" as of the April 1, 2016 valuation date.   However, the assessment was itemized by asset and "bifurcated" between the mill and the hydros.  Two individuals were involved in the valuation underlying the Town's assessment.  First was the Town assessors' agent.  Second was Michael Rogers, a supervisor of municipal services at Maine Revenue Services, who was enlisted as an advisor at the agent's request.  Rogers provided calculations as guidance for the Town's assessment.  The Town followed Rogers's guidance for valuing the hydros but modified, in part, his valuation of the mill assets.

[¶10]   Rogers's valuation of the hydro assets situated in Madison involved three "approaches" to valuation: the cost approach, the income approach, and the sales comparison (or market) approach.   Once Rogers completed his calculation of value under the three approaches, he incorporated them into a final figure and subtracted an amount corresponding to the percentages of the hydros located in Anson.  He also excluded the value of equipment eligible for exemption from property tax under Maine's Business

6

Equipment Tax Exemption (BETE) program, *see* 36 M.R.S. §§ 361-700B (2021).[2]

His final assigned value for the taxable hydro assets situated in Madison was

$34,295,500. The Town adopted this figure in its assessment.

[¶11] Based on MPI's mill closure announcement, Rogers assumed the

mill assets' "highest and best use" for valuation purposes to be liquidation

rather than continued operation. Rogers's valuation of the mill assets relied on

the cost approach rather than the income or sales comparison approaches. His

analysis factored in the age and condition of the premises and equipment as

well as economic obsolescence based on UPM's sweeping restrictions on the

equipment's use after sale. He ultimately determined that the reproduction

cost of the mill assets should be reduced by 90 percent to reflect economic

obsolescence. His final calculation of the value of the mill assets was

$21,341,883.

[¶12] The Town largely followed Rogers's guidance for the mill

assessment, though it set the subtraction for economic obsolescence at

82 percent, rather than 90 percent, because it disagreed with his assumption

---

[2] Subchapter 4-C of the Maine tax code, addressing the "Business Equipment Tax Exemption," has been amended multiple times since April 1, 2016. *See, e.g.*, P.L. 2019, ch. 659, § B-1 (effective March 18, 2020) (codified at 36 M.R.S. § 691 (2021)). However, the relevant statutes have not been altered in ways that affect our analysis.

that liquidation represented the mill's "highest and best use." The Town based its departure from Rogers's obsolescence figure on several factors, including, among others, the mill's active paper production status as of April 1, 2016, benefits the mill received through a reduction in its valuation for the 2015 fiscal year, the recent installation of a gas line, and MPI's successful pursuit of the United States government's imposition of tariffs on Canadian SC paper the previous year. The Town's assessment of the taxable mill assets (excluding BETE property) was $38,070,181. Thus, the Town's assessment of the mill and hydro assets—as an operational whole—was $72,362,681.

## C.     MPI's Appraisal

[¶13]  MPI retained the firm of Duff & Phelps to appraise the mill and hydro assets. The Duff & Phelps appraiser was Robert Herman, who inspected the mill and hydro properties in May 2017 and issued a written report setting out his conclusions.

[¶14]  Like Rogers, Herman assumed—based on MPI's determination that the mill would be closed and that the mill property, mill assets, and hydros would not thereafter be used to make paper—that the "highest and best use" of the mill assets would be liquidation. Herman's valuation of the mill assets used only the sales comparison approach to set their liquidation value at $2,675,000.

His analysis made no reference to the restrictions MPI had placed on the buyer's use of the mill equipment and therefore did not analyze their potential effect on the sales price.

[¶15]    Herman valued the hydro assets situated in Madison at $31,787,000.  Unlike Rogers, Herman did not separate out the value of the BETE equipment in his valuation of the hydro assets.  His valuation was based on only the sales comparison and income approaches.  He did not complete—and therefore did not include—the cost approach.

**D.    The Board's Determinations**

[¶16] The Board found that Herman's valuation of the mill assets was not credible for several reasons.  First, it took issue with Herman's conclusion that liquidation was the mill's "highest and best use."  Specifically, the Board, agreeing with several of the factors underlying the Town's decision to deviate from Rogers's valuation of the mill assets, noted that the mill property was considered "state of the art."  Further, it found that Herman's report and hearing testimony never discussed whether the comparable sales cited in his sales comparison analysis were subject to owner-imposed restrictions on use comparable to those imposed by MPI on the mill assets.  It then found that

Herman's report failed to distinguish between liquidation (or salvage) value and scrap value.

[¶17]  The Board also found that Rogers's and Herman's determinations that liquidation was the "highest and best use" of the mill assets were based on MPI's March 2016 closure announcement and that the announcement alone did not support a finding that the mill's "highest and best use" was liquidation.  The Board determined that the mill's "highest and best use" was its "current use" as of April 1, 2016, as an operating paper mill.

[¶18]  The Board agreed with Rogers's use of the cost approach to value the mill assets and criticized Herman's reliance on the sales approach, noting that "[o]wner-imposed restrictions may distort the market price if a market remains for the property as unrestricted.  In such circumstances the cost approach is appropriate to valuation for property tax purposes[].  Here, [Herman's] failure to apply the cost approach to the mill assets is not credible."

[¶19]  The Board next found that MPI failed to meet its burden of proving that the Town's assessment overvalued the hydros by a large enough amount to overcome the "defense of the assessment" provided by 36 M.R.S. § 848-A (2021) for assessments "accurate within reasonable limits of practicality, except when a proven deviation of 10 [percent] or more from the relevant

assessment ratio of the municipality . . . exists." It found that the hydro property was assessed at its full fair market value as of April 1, 2016, based on the Town's 100 percent assessment ratio. The Board also found that MPI's appraisal for the hydro property failed to separate out the taxable assets from the BETE assets, meaning that MPI had not proffered a valuation figure for the taxable hydro assets to compare against the Town's assessed value for those same assets. Using the only valuation figure that MPI provided for the hydro assets, the Board found that "[g]iven the 100 [percent] assessment ratio . . . the difference between the assessed value of $34,292,500 and the asserted value of $31,787,000 is within ten [percent] and therefore not substantial." *See* 36 M.R.S. § 848-A.

[¶20]   Lastly, the Board rejected MPI's argument that the Town's assessment double counted the value of energy produced by the hydros by including it in the assessment of both the mill assets and the hydro assets.

[¶21]  MPI filed in the Superior Court a petition for judicial review of the Board's decision. *See* 5 M.R.S. §§ 11001(1), 11002 (2021); M.R. Civ. P. 80C. It argued that the Board erred in (1) determining the "just value" of the taxable portions of the mill and hydros situated in Madison, (2) failing to correctly apply in its analysis the concept of "highest and best use," and (3) double

counting the value of the energy produced by the hydros by factoring that value into both the value of the mill and the value of the hydros. After holding a hearing, the court issued an order denying MPI's petition and affirming the Board's decision. MPI timely appealed from the judgment. *See* 14 M.R.S. § 1851 (2021); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶22] "A municipality's property valuation is presumed valid . . . ." *Glenridge Dev. Co. v. City of Augusta*, 662 A.2d 928, 931 (Me. 1995). That presumption can only be overcome if the taxpayer seeking the abatement proves "that the assessed valuation in relation to the just value is manifestly wrong." *Delta Chems., Inc. v. Town of Searsport*, 438 A.2d 483, 484 (Me. 1981) (quotation marks omitted). MPI was therefore tasked with proving to the Board that "[t]he judgment of the assessors was irrational or so unreasonable in light of the circumstances that the property [was] substantially overvalued and an injustice result[ed]." *Cent. Me. Power Co. v. Town of Moscow*, 649 A.2d 320, 323 (Me. 1994). To do so, MPI had to present credible evidence of value to impeach the Town's assessment. *See City of Waterville v. Waterville Homes, Inc.*, 655 A.2d 365, 367 (Me. 1995). Only then could the Board undertake the relevant "comparison between the local assessment and the

version of value that the [taxpayer] contends is the just one." *Id.* If the taxpayer fails to provide the Board with credible evidence of "just value," then "the Board has no basis . . . for comparing the local assessment and the [taxpayer's] version of just value." *Id.*

[¶23] MPI raises what it labels as three legal arguments for overturning the Board's decision on appeal. It first argues that the Board committed legal error by misapplying the correct standard for valuation as prescribed by Maine's Constitution and statutes. *See* Me. Const. art. IX, § 8; 36 M.R.S. § 701-A (2021). Next, it argues that the Board committed legal error by deciding that the hydro assets should be valued based on their "highest and best use"—as merchant power plants—but that the mill assets should be valued based on their "current use." Finally, it argues that the Board committed legal error in deciding that the difference between the Town's assessed value and MPI's asserted value was within the range designated as "accurate within reasonable limits of practicality" by section 848-A. Although MPI proposes a de novo standard of review for errors of law, the second and third arguments raise primarily factual, not legal, challenges to the Board's decision and therefore are subject to review for clear error.

**A.    The Board's Decision Regarding the Parties' Valuation Evidence**

[¶24]   MPI contends that the Board ignored the Maine Constitution's requirement that it apply the "just value" standard to valuing the property.  MPI claims that the Board committed an error of law by deciding that the mill should be valued based on its "current use" as of April 1, 2016 rather than its "highest and best use," which MPI asserts was its liquidation or salvage value.[3]

[¶25]   The Maine Constitution provides that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof."  Me. Const. art. IX, § 8.

[¶26]   "Just value means market value." *Weekley v. Town of Scarborough*, 676 A.2d 932, 934 (Me. 1996) (quotation marks omitted).  Moreover, "the market value of property should be determined on the basis of its best and highest use."  *Luce v. Me. Fid. Life Ins. Co.*, 323 A.2d 589, 591 (Me. 1974) (quotation marks omitted).

[¶27]   The term "highest and best use" is an appraisal term of art that defines the standard by which the market value of real property is established.

---

[3]  MPI's argument conflates the role of the Board, as a reviewing body, with the role of the assessors.  The Board does not "value" property.  Rather, it reviews assessors' valuations and then determines whether taxpayers have proved that the assessors' judgment "was irrational or so unreasonable in light of the circumstances that the property [was] substantially overvalued and an injustice result[ed]."  *Cent. Me. Power Co. v. Town of Moscow*, 649 A.2d 320, 323 (Me. 1994).

*See id.*; *see also Snyder v. Dana*, No. CV-05-720, 2007 Me. Super. LEXIS 194, at *21 n.6 (Sept. 20, 2007) (quoting Am. Inst. of Real Est. Appraisers, *The Appraisal of Real Estate* 45 (10th ed. 1992) (defining "highest and best use" as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.")).

[¶28]   However, what constitutes the highest and best use of any particular property is necessarily a question of fact. *See, e.g.*, *Walgreen E. Co. v. Town of W. Hartford*, 187 A.3d 388, 403 (Conn. 2018) ("[A] trier's determination of a property's highest and best use is a question of fact . . . ." (quotation marks omitted)); *DeLucca v. DeLucca*, 871 A.2d 72, 75 (N.H. 2005) (holding that the trial court did not err by valuing property based on its "highest and best use" and that "valuation of property is a question of fact"); *Scott Constr., Inc. v. City of Newport Bd. of Civ. Auth.*, 683 A.2d 382, 384 (Vt. 1996) (noting that the taxpayer failed to show that the trial court's finding of a parcel's "highest and best use" was clearly erroneous).

[¶29]  Municipal assessors determine a property's "highest and best use" by considering factors such as "current use, physical depreciation, sales in the secondary market, functional obsolescence and economic obsolescence." 36 M.R.S. § 701-A; *see Weekley*, 676 A.2d at 934; *Luce*, 323 A.2d at 591.  Further, assessors are permitted "considerable leeway in choosing a method to reach just valuation of property." *Delta Chems.*, 438 A.2d at 484.  Our decisions have endorsed "at least three standard appraisal methods of determining the market value of real property: (1) the 'comparative' [sales] or 'market data' approach, (2) the 'income' or 'capitalization' approach, and (3) the 'reproduction cost less depreciation' or 'cost' approach." *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 390 (Me. 1981) (citing *Kittery Elec. Light Co. v. Assessors of the Town of Kittery*, 219 A.2d 728, 737 (Me. 1966); *Sweet, Inc. v. City of Auburn*, . . . 134 Me. 28, 32, 180 A. 803, 804 (1935)).  All three approaches were used in the Town's and MPI's valuations of the mill and hydro assets.

[¶30]  Upon review, the Board decides what weight should be given to the municipality's valuation and the taxpayer's appraisal in deciding whether the taxpayer has met its burden of persuasion.  *See City of Waterville*, 655 A.2d at 367.  We review the Board's findings for clear error.  *See Town of Eddington v. Emera Maine*, 2017 ME 225, ¶ 14, 174 A.3d 321.  Here, the Board found MPI's

appraisal and its underlying factual assertions not credible and concluded that MPI had failed to meet its burden. *See City of Waterville*, 655 A.2d at 367.

[¶31] MPI's argument on appeal—that the Board erred as a matter of law in upholding the Town's valuation of the mill assets based on their "current use"—assumes incorrectly that, as a matter of law, a property's "current use" cannot also be its "highest and best use." "Current use" and "highest and best use" are indeed distinct concepts. However, a property's "current use" informs the determination of its "highest and best use" for purposes of the property's "just value." *See* 36 M.R.S. § 701-A (assessors are to consider "current use" among other factors in determining "just value"); *Luce*, 323 A.2d at 591. The Board was not persuaded that "liquidation is the highest and best use of the property as of April 1, 2016, rather than its current use on that date as an operating mill complex." The Board plainly did not conflate or confuse "current use" with "highest and best use," but found—in this instance—that the mill's "current use" was its "highest and best use."

[¶32] The Board pointed out that at the time of the assessment the mill was a state-of-the-art facility operating "unrestrictedly in the black," that its owners were not in any financial difficulty, and that they had announced the mill's closure without "communicating cooperatively with the Town." Likening

MPI's actions to those of a residential property owner deciding to tear down an unwanted home, the Board found in essence that the mill had been closed and its equipment and machinery sold as scrap under restrictions because its owners did not want to operate it anymore and did not want anyone else to operate it, but that the owners' business decisions should not dictate the mill's "highest and best use." These are all factual determinations, and MPI's contention that they are subject to the de novo review standard used for errors of law is incorrect.

[¶33] MPI's second challenge to the Board's "highest and best use" finding—that the Board itself "assessed the mill"—is equally flawed. The Board simply rejected MPI's appraisal as incredible, starting with MPI's view of the mill assets' "highest and best use" as being their liquidation value. *See Waterville Homes*, 655 A.2d at 367. Rejecting MPI's evidence as to the mill's "highest and best use" was within the Board's prerogative as fact finder. *See Handrahan v. Malenko*, 2011 ME 15, ¶ 14, 12 A.3d 79 ("[D]etermining what weight to give expert testimony is exclusively within the province of the fact[]finder."); *Waterville Homes*, 655 A.2d at 367. Based on its view of the evidence, the Board decided that MPI failed to prove that the "judgment of the assessors was irrational or so unreasonable in light of the circumstances that

the property [was] substantially overvalued." *Cent. Me. Power Co.*, 649 A.2d at 323. That determination was not erroneous.

**B.    Double Counting the Value of the Hydro Assets**

[¶34]  MPI next argues that the Board committed legal error by upholding an assessment that counted the value of the energy produced by the hydro assets twice—once by including that value in the valuation of the hydro assets as "merchant power plants" that sell their power in the market and again by attributing the value of energy supplied by the hydros to the mill as an "avoided cost," thereby increasing the value of the mill. The Board found that the 40 percent of the mill's energy requirement that the hydros provided constituted an avoided cost for the mill, which the Board deemed equivalent to income for the mill. MPI points to this finding in arguing that the Board committed legal error by upholding an assessment that factored the value of the energy produced by the hydros into the value of the mill assets as well as into the value of the hydros. However, the Board's finding does not necessarily mean that the Town's valuation factored the avoided cost into its assessment of the mill assets.

[¶35]  Under the income approach to valuation, the value of property is essentially derived from the net income capable of being generated by the

property.  *See* Larson, *Valuation Handbook*, § 5.03 (Matthew Bender 2020) ("The income capitalization approach focuses on determining the anticipated future benefits to be derived from the property and then determining the present value of that future stream of income.").  Using the income approach in this instance, the value of the energy generated by the hydros could be factored into the assessed value of either the mill or the hydros but not both.  Either the hydros have added value based on the income they could produce by selling the energy to a third party or the mill has added value from avoiding the cost of the energy that it receives from the hydros.

[¶36]  If Rogers had used the income approach to value both the mill assets and the hydro assets, MPI's argument might have merit.  However, Rogers's valuation of the mill assets relied on the cost approach, not on the income or sales approaches, a point acknowledged in MPI's brief.[4]  Because Rogers did not rely on the income approach in valuing the mill assets, the Town's assessment of the mill assets did not count the value of the energy

---

[4] MPI's double-counting argument hinges primarily on Rogers's testimony at the hearing during cross-examination, about how he factored the value of the energy supplied to the mill by the hydros into his valuation of the hydros using the income approach.  Because Rogers did not rely on the income approach in valuing the mill and relied less on the income approach and more on the sales and cost approaches in valuing the hydros, the Board did not err in rejecting MPI's double-counting argument as being unsupported by the evidence.  *Handrahan v. Malenko*, 2011 ME 15, ¶ 14, 12 A.3d 79.

generated by the hydros as an avoided cost equivalent to income. The Board's finding that there had been no double counting was thus consistent with the evidence. *See Emera Maine*, 2017 ME 225, ¶¶ 14, 19, 174 A.3d 321.

## C.    Misapplication of Section 848-A

[¶37]    MPI's final argument is that the Board misapplied 36 M.R.S. § 848-A when it determined that the difference between the Town's assessed value of the Madison portion of the hydros and the value proffered in MPI's appraisal were within 10 percent of one another and therefore fell "within reasonable limits of practicality" pursuant to section 848-A.

[¶38]  The statute provides, in pertinent part:

> In any proceedings relating to a protested assessment, it is a sufficient defense of the assessment that it is accurate within reasonable limits of practicality, except when a proven deviation of 10 [percent] or more from the relevant assessment ratio of the municipality or primary assessing area exists.

*Id*. Given that the Town's assessment ratio was 100 percent, or full market value, the Board interpreted the statute to mean that any overvaluation should be deemed "not substantial," *see Cent. Me. Power Co. v. Town of Moscow*, 649 A.2d 320, 323 (Me. 1994) (noting that it is the taxpayer's burden to prove that the municipal assessment "substantially overvalued" the property), unless MPI proved that the full market value of the taxable hydro assets was more than

10 percent less than the Town's assessed value.[5]  Such proof would mean that the Town's assessment deviated by more than 10 percent from the relevant 100 percent assessment ratio.

[¶39]  The Town valued the hydros at $37,064,500 but assessed the property tax based on a value of $34,292,500 after subtracting the assessed value of the equipment that was exempt from taxation under the BETE.  The Board found that the Town's $34,292,500 assessed value for the taxable hydro assets was within 10 percent of MPI's only proffered appraisal value for the hydro property, $31,787,000, and was therefore reasonable.

[¶40]  MPI does not challenge the Board's interpretation of section 848-A.  Rather, MPI argues that, in comparing the parties' values, the Board should have utilized the Town's total value of $37,064,500, a figure that includes the value of BETE equipment.  If the Board had done so, the difference between the Town's value and MPI's value would have been roughly 14 percent.

[¶41]  This argument is unpersuasive.  In an appeal from the denial of a property tax abatement, the value of the taxpayer's tax-exempt property that is excluded in the protested assessment is plainly irrelevant to the section 848-A

---

[5]  A municipality's assessment ratio is the ratio of the assessed value of all taxable real property within its borders to the fair market value of the property.  *See Weekley v. Town of Scarborough*, 676 A.2d 932, 935 n.1 (Me. 1996).

comparison. The BETE statute did require the Town to value and assess MPI's BETE-eligible assets, but only for purposes of reimbursement by the State, not for purposes of taxation. *See* 36 M.R.S. § 694 (2021).

[¶42] The Board's finding that the Town's value for MPI's taxable hydro assets was within 10 percent of the property's fair market value for purposes of section 848-A was supported by the evidence.[6]

The entry is:

Judgment affirmed.

Jonathan A. Block, Esq. (orally), and Olga J. Goldberg, Esq., Pierce Atwood LLP, Portland, for appellant Madison Paper Industries

David P. Silk, Esq. (orally), Curtis Thaxter, LLC, Portland, for appellee Town of Madison

Somerset County Superior Court docket number AP-2019-05
FOR CLERK REFERENCE ONLY

---

[6] MPI made an alternative argument to the Board that it should subtract the Town's assessed value for the BETE hydro equipment from Herman's appraisal value for the hydro assets and compare the resulting number with the Town's assessed value for the taxable hydro assets. The Board responded by pointing out that to combine the Town's assessment analysis with Herman's appraisal analysis in that manner would be to compare "different value conclusions in a way that distorts the result and is not credible." MPI has not pressed its alternative argument on appeal.